# KAPIOLANI ESTATE, Limited *v.* A. S. CLEGHORN.

## EXCEPTIONS FROM CIRCUIT COURT, FIRST CIRCUIT.

SUBMITTED JANUARY 14, 1902.          DECIDED JULY 25, 1902.

FREAR, C.J., GALBRAITH AND PERRY, JJ.

It is not error to refuse to instruct the jury that a certain article of a certain constitution was in force during a certain period, without stating the substance of the article, even if the article were applicable to the case.

Time does not run against the state even though the state does not acquire title until after the period of limitation has begun to run against the prior owner.

The rule that time does not run against the king applied to the King of Hawaii in his capacity as sovereign only, and not in his private capacity.

Article 39 of the Constitution of 1864, which provided that, "The King's private lands and other property are inviolable," though applying to his strictly private lands as distinguished from crown lands, did not prevent the statute of limitations from operating upon such private lands.

Evidence held sufficient to justify the giving of instructions as to the law of tacking successive adverse possessions.

Where one is shown to have been in possession for the period of limitation apparently as owner, and the possession is not explained or otherwise accounted for, it will be presumed to have been adverse, although the presumption is open to rebuttal.

Instructions need not be given in the form requested if given substantially in other form.

Evidence held sufficient to support the verdict.

OPINION OF THE COURT BY FREAR, C.J.

(Perry, J., dissenting.)

The case is sufficiently stated in Mr. Justice Perry's dissenting opinion. It is a case of ejectment and comes here on ninety-two exceptions, only a few of which are now relied on. The only question is whether the defendant made out a case of adverse possession. The trial was lengthy and the contest was chiefly upon the question of fact as to whether the defendant's possession had been adverse for the statutory period, and most of the instructions asked or given related to the general law of adverse possession. But at the close of the case, perhaps as an after-thought or as a result of a new discovery, the plaintiff raised the question whether the holding could be adverse as matter of law, however adverse it may have been in fact, for the reason that during a portion of the period in question the King had the paper title and during a smaller portion of that time the Constitution of 1864 was in force, which provided, in Article 39, that, "The King's private lands and other property are inviolable." This is made the chief point in this court and will be considered first.

The exception by which this question is brought here is that to the refusal to give the following instruction: "The jury are instructed that Article 39 of the Constitution of 1864 was the law of the land until the promulgation of the Constitution of 1887." This instruction was properly refused, if for no other reason, because it was meaningless so far as the jury was concerned. Of course that article was the law of the land until it was abrogated. There was no dispute about that, and the verdict could not properly have been influenced one way or the other by that mere statement. The court was not even requested to state the substance of that article, much less to construe it. It might as well have instructed the jury that any other article of that constitution or the whole constitution was in force until abrogated. There is nothing whatever to indicate that the jury even overheard the article read when the matter was argued to the court. We are informed that it was argued, though ap-

parently very briefly, but there is some reason to believe that the jury was not then present. The plaintiff could hardly expect the instruction to be given on the idea that the jury should find a copy of that constitution and construe it for themselves.

There are, however, certain other exceptions under which it might at least be argued that the same question could be raised, although the giving and refusing of instructions, to which such exceptions were taken, was apparently based on the theory that such instructions were intended, as probably they were, to relate only to the general law of adverse possession. The question will therefore be briefly considered on its merits.

The question is whether this constitutional provision prevented the running of the statute of limitations against the King as to his private lands, that is, whether one could acquire title by adverse possession as against the King in his private or natural capacity.

The question is one of great difficulty. Probably the article was intended to relate to crown lands as distingushed from government lands, for it was copied from the constitution of 1852 (Art. 41), and at that time the crown lands were regarded as private lands for many purposes and were often spoken of as such. See *Estate of Kamehameha IV*, 2 Haw. 715. But, whether it was intended to relate to such lands or not, it seems clear that it was intended to relate to lands, such as those in question, owned by the King in his private capacity. The question would then remain whether the word "inviolable" should be construed as exempting the King's private lands from the statute of limitations.

If the statute could not run against the King in case he had the title when the adverse possession began, the fact that he did not acquire the title in this instance until after the adverse possession began would not prevent the statute being stayed as soon as he did acquire title. The same rule would apply in such case as applies when a state acquires title after the statute has begun to run. As soon as the state acquires title the running is stayed. *United States v. Nashville, &c. R'y. Co.*, 118 U. S. 120, 126.

The general rule that disabilities arising after the statute once begins to run do not interrupt it, does not apply in this instance, for no subsequent disability arose when the King acquired title, for he could sue though he could not be sued.

Nor should the approval of the statute of limitations by the King be construed as a waiver of his constitutional exemption, if the exemption would otherwise apply. *Wellion v. Berkley,* Plowd. 239, 240, quoted in note to *People v. Herkimer,* (4 Cow. 345), 15 Am. Dec. 379.

The common law differed in many respects in its application as between the King and his subjects. The King, however, was recognized as having a natural and a political capacity. He could hold land in each capacity. Lands held in his private or natural capacity descended to his heirs. Those held in his political capacity descended to his successors. 8 Bac. Abr. Tit. Prerogative, E. 2; Co. Litt. 15b. and note (4). This distinction existed here as between the King's private lands strictly speaking and his crown lands. It is said that anciently, at common law, prescription ran against the King as against other people as to his private lands, but not as to lands appurtenant to the crown, but that for several centuries this distinction has not been observed and that the crown is excepted by implication from the operation of statutes of limitation unless expressly named. *United States v. Hoar,* 2 Mason 311, 313. Statutes of limitation have been passed in England and many of the United States which by their express terms run against the King or the State.

Whatever may be the rule at common law, it seems to be conceded by the plaintiff that the common law maxim *nullum tempus occurrit regi* did not apply here as to the King's private lands. That is supposed to have been a prerogative of the King as sovereign and not in his private capacity, and is possessed by even republican governments as an attribute of sovereignty. It was expressly held in *Harris v. Carter,* 6 Haw. 195, 209, that time would run against the King as to crown lands even. Much more would that be the case as to his strictly private lands. The

plaintiff's contention is, not that the general rule applicable to sovereignties applies here, but that the special constitutional provision in question applies to the King's private lands. But what force was the word "inviolable" intended to have? Was this provision intended, for instance, merely to cover substantially the same ground as that covered by the provision in the constitution of 1840 that, "He also shall retain his own private lands"? A number of provisions of the constitutions of 1852 and 1864 were but restatements, in more exact or more modern form, of provisions in the crude constitution of 1840. Was this provision intended to mean that the King's private lands should continue to be regarded as such and not be regarded as held by the King in his political capacity, or as subject to legislative action, as were the government lands? The provision is very indefinite. There are other provisions protecting the property and other rights of subjects. Was the provision relating to the King intended to go farther than the provisions, worded just as strongly, relating to the people generally? Perhaps so. Perhaps not. If not, its presence could be accounted for on the ground that the King occupied a dual position, as others did not, and consequently that there was danger that in regard to his rights there might be confusion in the absence of such a provision. If the intention was to give him greater rights, what greater rights? We need not undertake to say. There is much reason to suppose that the intention was not to exempt the King's private lands from the operation of the statute of limitations and, the question being at least one of doubt, the leaning should be towards the more enlightened view.

In support of this we may refer to former decisions of our own courts in so far as they bear on the question, and reason by analogy from decisions of other courts on other constitutional provisions.

For instance, in *Estate of Kamehameha IV, supra*, it was held that even the crown lands, limited though they were to the King and his successors, were subject to dower. If they be-

lcnged to the successor King on the demise of the predecessor
King, and if, because they were "inviolable", they were not sub-
ject to general limitation laws, would they be any more subject
to the general dower law? If they were, the Queen Dowager of
the former King would take an estate for life in one-third of the
reigning King's lands under the general law without the latter's
consent.

Again, in *Harris v. Carter, supra*, the court actually decided
the very question now before us. It is contended that the opinion
there expressed on this point was only a *dictum*, but it appears to
have been an actual decision. The question was whether the
plaintiffs had title to certain lands which the Commissioners of
Crown Lands claimed as crown lands. The plaintiff claimed (1)
by devise from Kamehameha III to his Queen, Kalama, by des-
cent from the Queen to Charles Kanaina, and by deed from Ka-
naina to himself, and (2) by adverse possession begun by Queen
Kalama after the death of Kamehameha III. The court held
that the title to the lands in question did not pass by the devise,
descent and deed, and consequently it became necessary to de-
cide upon the validity of the second contention, that of adverse
possession. It was decided that adverse possession could be held
against the Kings Kamehameha IV and V. Up to that point in
the case evidence as to adverse possession had been fully put in as
to only one of the lands in question, as to which the evidence was
held not sufficient. The court left the parties at liberty to intro-
duce evidence as to adverse possession in regard to the other lands
involved. The parties thereupon, as the papers on file show, con-
sented to judgment for the plaintiff as to certain of those lands
and for the defendants as to the rest. It is true that the decision
was by a single judge only, but it was by one peculiarly fitted for
deciding the question by reason of his familiarity with the polit-
ical and constitutional history of the islands and the views of the
chiefs and people. The judgment was not questioned or ap-
pealed from although the defendants, besides being familiar with
the ancient conditions and laws themselves and representing in

a sense the King himself, were represented by counsel of ability and learning, a former member of the Supreme Court. It may be, also, that the attention of the court was directed only to the general maxim that time does not run against the King and that the constitutional provision was overlooked. But, considering who were concerned or took part in that case—the Justice, the counsel, the Commissioners of Crown Lands and the King himself—and the importance of the question, it would seem that either the constitutional provision was thought not to apply if it was noticed, or else that in the opinion of those who, if any, ought to know, there was nothing in Hawaiian ideas or customs or history or the status of the King beyond what appertained to kings generally that would exempt his private lands from the operation of the statute. That being an actual and carefully considered decision by the best authority, and the point being at least a doubtful one, it would seem that we ought not to take a backward step by overruling it.

Decisions in somewhat analogous cases elsewhere tend to support the holding that the King's lands are not violated by the application of the statute of limitations to them. The Federal constitution provides that, "No State shall  *  *  *  pass any *  *  *  law impairing the obligation of contracts." And yet there is no question of the constitutionality of a statute which, though enacted after a contract has been made, limits or reduces the time within which action may be brought on it, provided a reasonable time is allowed—even though the effect of a failure to bring action within the time limited is to take away all remedy and destroy the value of the contract. *Gilfillan v. Union Canal Co.*, 109 U. S. 401; *Cranor v. School District*, 151 Mo. 119. The Constitution of California provided that each stockholder of a corporation should be personally liable for his proportion of all debts contracted while he was a stockholder, and contained no limitation as to the time within which action might be brought. But it was held that the statute of limitation "does not attempt to relieve the stockholder from his liability under the constitu-

tion; it only limits the time within which the action may be brought, and this is not inconsistent with the constitutional declaration that such liability is imposed upon the stockholder." *Santa Rosa Nat. Bank v. Barnett*, 125 Cal. 407. Indeed, the constitution of 1864 itself contained provisions that protected the private property of subjects generally, and all modern constitutions contain similar provisions protecting life, liberty and property. Private property as a rule cannot be taken except for public use and then only upon just compensation and by due process of law. And yet no one questions the constitutionality of reasonable statutes of limitation the effect of which is usually held to be in the case of specific property to actually transfer the title as well as bar the remedy.

Exceptions were taken also to certain instructions given at the request of the defendant, to the effect that, if the jury found certain enumerated facts, the defendant was the heir of his daughter the Princess Kaiulani, and that the possessions of several possessors between whom there is privity of estate, such as ancestor and heir, may be added together. It is not disputed that these instructions set forth correct law. The contention is that they were inapplicable because the evidence showed that the daughter never had possession. In our opinion, there was sufficient evidence to justify the giving of these instructions. There seemed to be some uncertainty in the defendant's testimony at first as to whether he held possession originally in his own right or in that of his wife or daughter, but he finally seemed to take the position that it was in his own right. But there was considerable testimony, drawn out largely by the plaintiff, tending to show a parol gift to the daughter and that the defendant had been regarded as holding in her right until her death. There was no doubt that he was her heir. This justified the instructions as to tacking possessions.

Another exception was to the defendant's requested instruction that, "Where one is shown to have been in possession of land for the period of limitation, apparently as owner, and such pos-

22-D

session is not explained or otherwise accounted for, it will be presumed to have been adverse, although this presumption is open to rebuttal." This instruction was taken substantially from 1 Am. & Eng. Enc. of Law (2nd ed.) 889. It was held to be correct law in *Sister Albertina v. Kapiolani Estate, Limited, ante,* 321. Grouped with this exception are exceptions to the refusal to give two instructions requested by the plaintiff to the effect that if the defendant was allowed by the holder of the legal title to take possession and if he took possession with the consent of the owner, as a matter of convenience and without any understanding that the property should belong to the defendant, the possession, however long continued, would not bar a recovery, and that consent need not be expressed in words, but might be shown by acts and attendant circumstances, and that certain enumerated acts might be taken into consideration in determining the question of consent. In so far as these refused instructions were warranted by the evidence, their substance was sufficiently covered by other instructions that were given.

It is contended under other exceptions that there was no evidence to sustain the verdict. The evidence is voluminous and it will serve no useful purpose to review it at length. The main contention on this point is that the possession was shown to be permissive and not adverse. It must be conceded that there is much that can be said in support of this contention. But the argument is one that would more appropriately be addressed to the jury. On the whole, in our opinion, there was sufficient evidence to sustain the verdict, whether the weight of the evidence was on that side or not.

The exceptions are overruled.

*Kinney, Ballou & McClanahan* for the plaintiff.

*Robertson & Wilder* for the defendant.

DISSENTING OPINION OF PERRY, J.

This is an action of ejectment, the land in controversy consisting of two pieces situate at Waikiki, Oahu, one being makai of

the main Waikiki road, a beach lot, and the other being several hundred feet mauka of the road. The plaintiffs claimed title by deed and inheritance; the defense was adverse possession for the statutory period. The judge presiding at the trial charged the jury that the plaintiff had established a paper title to all the land sued for, and that instruction was not excepted to. The sole question left to the jury to determine was whether or not the plaintiff's title had been defeated or his right to recover herein barred by adverse possession on the part of the defendant or on the part of his daughter Kaiulani and himself. The jury rendered a verdict for the defendant.

Undisputed evidence showed that the beach lot, exclusive of subsequent accretions, i. e., as it was at the date of the award, and the mauka lot, excepting only a triangular piece on the westerly border containing about 1250 square feet, were granted, with other adjoining land, to M. Kekuanaoa by L. C. A. 104, F. L., Apana 5, and confirmed to him by R. P. 4493. From the patentee the two pieces passed by descent to King Kamehameha V and on the latter's death by descent to Princess Ruth Keelikolani. On November 16, 1876, the mauka piece, including the small triangle above referred to, was, as a part of a much larger tract, conveyed by deed by Keelikolani to King Kalakaua, and on April 16, 1880, the makai piece, also as a part of a larger tract, was conveyed by deed by Keelikolani to the same grantee. Kalakaua died January 20, 1891, and under his will all of his title to the two pieces in controversy passed to his widow, Queen Dowager Kapiolani, from whom by various mesne conveyances the paper title passed to the plaintiff.

One of the exceptions is to the trial court's refusal to instruct the jury, *inter alia*, that "Article 39 of the Constitution of 1864 was the law of the land until the promulgation of the Constitution of 1887", another to the verdict on the ground that it was contrary to the law, the evidence and the weight of the evidence and a third to the court's refusal, *pro forma*, to grant a motion for a new trial. There was also an exception to the denial of

plaintiff's motion "that the jury be instructed to return a verdict for the plaintiff on the ground that there is no evidence here to support the defense of adverse possession", and one to the giving of the following instruction requested by defendant: "The law is that no person shall commence an action to recover possession of any land or make any entry thereon unless within twenty years after the right to bring such action first accrued. You are instructed that the right of the owner of the land in dispute to bring an action first accrued when the defendant, A. S. Cleghorn, commenced to hold possession of the same adversely to the owner, and if you believe that such adverse possession has continued uninterruptedly for at least twenty years from that time before the commencement of this action, your verdict will be for the defendant."

Article 39 of the Constitution of 1864, granted by Kamehameha V on August 20 of that year, is as follows: "The King's private lands and other property are inviolable." On behalf of the plaintiff it is contended that because of this provision the statute limiting the time within which an action may be brought to recover land or an entry be made thereon can have no application against the King as an individual and that title by adverse possession can not be acquired against him as such individual. If this position is correct, the verdict is contrary to the law and the evidence. Upon the view of the evidence most favorable to the defendant, his adverse possession commenced not earlier than December 25, 1875. Service of summons in this action was made October 10, 1899. Kalakaua ascended the throne in 1874, and the Constitution of 1864 continued in force until July 7, 1887. From November 16, 1876, then, until July 7, 1887, the title to the mauka piece, and from April 17, 1880, until July 7, 1887, that to the makai piece, were in the King, though as his private property, during a time when Article 39 of the Constitution of 1864 was in force. If the statute of limitations was not operating or the adverse possession not accruing during those periods, then, subtracting the shorter, seven years, from the maximum

claimed, twenty-four years, it is clear that the defendant's possession for the remainder, seventeen years, was insufficient to divest the title of the King or of those holding under him.

For the defendant the argument advanced in reply to the plaintiff's contention on this subject is two-fold: first, that the term "private lands" is not used in the Constitution in its ordinary acceptation but with reference solely to that part of the public domain reserved by the King for himself in the great mahele and later known as the "Crown Lands" and (2) that by the use of the word "inviolable" it was not intended to exempt the property described in the section from the operation of the statute of limitations or of the rule of adverse possession and that the intention was either to restrain the legislature from legislating as to the crown lands adversely to the King or to restrain the King from disposing of them injuriously to the public.

It is a rule in the interpretation of constitutions and perhaps of some other written instruments that words are to be under-. stood in their natural, ordinary and untechnical meaning unless the nature of the subject indicates or the context suggests that they were used in a technical sense. See Endlich on Interpretation of Statutes, p. 714, Story on Constitutions, § 451, and Cooley on Constitutional Limitations (6) p. 73. The word "private" is one of common usage and of well known signification. It seems almost superfluous to define it. "Belonging to, or concerning, an individual person; personal; one's own; not public; as, a man's *private* opinion; *private* property."—Webster's International Dictionary. I am unable to find within the Constitution itself any reason for believing that the word was not used in this, its ordinary acceptation; on the contrary it is not without indications that it was so used, for instance, it is closely followed, in Article 40, by a provision which undoubtedly refers to the King *as a private individual* and gives him an immunity not possessed by other inhabitants of the realm. "The king cannot be sued or held to account in any court or tribunal of the realm." See *Green v. Cartwright*, 7 Haw. 726. Article 31, "The person

of the King is inviolable and sacred", further discloses a disposition and an intention to extend immunities and privileges to the King *in his private capacity*.

It seems that in the days shortly following the Mahele the Crown lands were sometimes referred to as the King's private lands. It does not appear, however, that the term was thus used so widely as to acquire that special, technical signification. It may be that the words "private lands" are capable of being construed as meaning the lands known as the Crown Lands, but that they were not so used in the section in question is further demonstrated by the very language of that brief section. In the phrase "private lands and other property", the word "private" modifies the words "other property" as well as the word "lands". This shows that the word "lands" is there used not in the limited sense of Crown Lands but as including all lands coming under the class "private", as ordinarily understood. To the extent that the words "other property" are limited or qualified by the word "private", to that same extent is the word "lands" limited or qualified by the word "private."

Of greater difficulty is the ascertainment of the true meaning of the word "inviolable" as used in Section 39. What was the intention in inserting that section?

Some definitions are here given. "Inviolable. Having a right to or guaranty of immunity; that is to be kept free from violence or violation of any kind, as infraction, assault, arrest, invasion, profanation; incapable of being injured."—Cent. Dict. "That can not be violated; incapable of being injured or disturbed; exempt from legal prosecution or punishment."—Standard Dict. "Violate. To treat roughly or injuriously; to do violence to, interrupt or disturb."—Cent. Dict. "Injure. To do harm to; inflict damage or detriment upon; impair or deteriorate in any way."—*Ib*. "Impair. To diminish in quantity, value, excellence, strength; to deteriorate."—Anderson's Law Dict.

The King's interest in or title to land was property of his. Was such property violated by the operation of a statute of limitations

or by adverse possession by another? It may be that if our statute simply limited the time within which an action may be brought in a court for the recovery of the land, such a provision would not be such a violation. It has been held by courts that such statutes, purely of limitation of the time of bringing actions in courts, if reasonable, affect the remedy only and do not impair the right, because, it is argued, other remedies exist and the right continues good, only unenforceable in the legal tribunals. Our statute, however, goes further and limits not only the time within which an action may be brought but also the time within which entry may be made. It bars all remedy after the lapse of the period stated. Its effect, though it does not so specifically provide, is to extinguish the title of the real owner and to vest it in the adverse holder. Certainly that is the effect of the doctrine or rule of adverse possession, which is now too well established to require anything further than its statement. Whatever the reasons are for the rule or the theory on which it is based, that is its effect. "The statute of limitations gives a perfect title. *   * It is a mistake to suppose that the person barred by the statute loses nothing but his remedy. The law never deliberately takes away all remedy without an intention to destroy the right. Remedies are frequently changed. One is withdrawn and others remain, or one is substituted for another. But when all remedies are taken away after a specified period of neglect in asserting rights, and when this is done for the purpose of promoting the best interests of society, the right itself is destroyed. In this case, the tenant for life, at the time he released to the plaintiff could neither make entry nor maintain any real or possessory action. His right was completely vested in the person in possession. He had nothing whatever to convey."—*Moore v. Luce*, 29 Pa. St. 262. See also 3 Wash. R. P. 164.

If, then, our statute of limitations or the doctrine of adverse possession applied in their full force against the King in his personal capacity, their effect would be not only to impair but to absolutely destroy the right or title involved. Such title would suffer detriment and injury.

. It is argued in this connection that the divesting of title caused by the statute or by adverse possession is not a violation of the real owner's right or property, because the title passes by virtue of the presumed acquiescence or consent of the real owner. It is true that it is sometimes said that from a possession adverse for the statutory period the law conclusively presumes a grant or conveyance; but it is also true that in very many cases, perhaps in a majority of cases, this proves to be a mere fiction of law and that no such conveyance or acquiescence has been in fact made or given. The law, recognizing this, nevertheless regards the title as having passed, its policy being (in the absence of constitutional provisions to the contrary) for the peace of the community not to allow "a possession to be questioned after it shall have been enjoyed for such a length of time as renders it unreasonable, in the eye of the law, to require evidence, *aliunde*, that it was holden under a right of ownership derived from some other sufficient and legitimate source." See 3 Wash., R. P. 124. It seems to me that Section 39 cannot be held to be inapplicable on the theory that the divesting of title by adverse possession was the voluntary act of the King.

It may be said that if the application of the statute and of the doctrine of adverse possession violate the King's private property the same must be true as to the private property of any other individual. There is, indeed, a like violation; but in the case of other individuals the law and the courts, conceding the violation, declare that public policy requires that the negligent individual should suffer to that extent in order that there may be repose in titles and a feeling of security in those who have uninterruptedly held or tilled the soil for a long period of time and constitutions generally and those of these islands in particular have contained no inhibition to the contrary. In the case of the King, however, there was during the period in question, such an express inhibition. Hence the distinction.

What the "more enlightened view" of today is, should not be permitted to weigh in the construction of language used in 1864. It is to be remembered that we are not here dealing with condi-

tions as they exist at the present day but with a state of affairs existing prior to 1887 while Hawaii was a monarchy. In 1864 when Kamehameha V promulgated his Constitution, the idea was still prevalent among the native Hawaiians of the superiority of Kings over other men and of their being entitled to privileges and immunities not enjoyed by their subjects. Contact with other races had, it is true, already had some effect to the contrary, but that the King was in 1864 still regarded differently from other men is apparent from the Constitution itself. The King could not be sued or held to account in any court of the realm. Art. 40. Other men could. The King's *person* was inviolable. Art. 31. None of his subjects enjoyed that privilege.

In this connection it is well to note that all men were afforded a certain large measure of protection for their persons in the provision, Art. 9, that no person should be deprived of life, liberty or property without due process of law; but after due process of law a man could be deprived of his liberty and even of his life. Art. 39, however, gave the King immunity from any such punishment and from all other harm or injury to his person. So, too, a subject, could, after due process of law, be deprived of his property. In my opinion, Art. 39 was intended to give the King a similar immunity as to his property and to render it incapable of being taken away from him or injured or destroyed by any method. Section 39, as well as Article 31 where the same word "inviolable" is used, must have been intended to secure to the King in his private capacity privileges and immunities, as to his property and as to his person, not enjoyed or possessed by other men; otherwise those provisions were wholly unnecessary, for, regarded purely as a private individual, the King would be one of those persons referred to and protected by other clauses of the Constitution.

That the acquisition of title by adverse possession is in fact an injury to the rights of the real owner and a loss to him, has been repeatedly recognized. For example, in referring to the maxim, *nullum tempus occurrit regi,*—a maxim not to be confounded, of course, with the constitutional provision under consideration—

Angell in his work on Limitations says, at p. 31: "It is some-times asserted that the reason of the above maxim is, that the King is always busied for the public good; and, therefore, has not leisure to assert his right within the time limited to subjects. The true reason, it has been thought, however, is the great public policy of *preserving* the public *rights*, revenues and *property* from *injury* and *loss* by the *negligence* of public officers." See also Lessee of *Cincinnati v. Church*, 8 O. 310. In weighing and applying the evidence in support of such a title, the acts of the *wrongdoer* are to be construed strictly and the *true owner* is not to be *barred* of his *right* except upon clear proof."—*Cook v. Babcock*, 11 Cush. 206. "In the first place, inasmuch as the title of the true owner may, by the application of this statute, be often *divested* by the *wrongful* act of another, the law is stringent in requiring clear proof of the requisite facts."—3 Wash. R. P. 135. In *Bicknell v. Comstock*, 113 U. S. 152, the court quoted with approval from *Leffingwell v. Warren*, 2 Black, 599, the state-ment that "the lapse of time limited by such statutes not only bars the remedy, but it *extinguishes* the *right* and *vests a per-fect title in the adverse* holder." Adverse possession is "an actual, visible and exclusive appropriation of land, commenced and continued under a claim of right, with the intent to assert such claim against the true owner, and accompanied by such *invasion* of the *rights* of the opposite party as to give him a cause of action."—1 Am. & Eng. Encycl. Law, 2nd ed., 789. See also *Barrell v. Title Guarantee Co.*, 27 Or. 81.

The contention that by Article 39 it was intended merely to restrain the King from disposing of the Crown Lands injur-iously to the public, is untenable. The provision was in-tended for the protection of the King and not of the public. The public lands were sufficiently protected by the maxim *"nullum tempus occurrit regi."* Was it not natural in framing the Constitution to wish to extend or reserve a similar exemption to the King's private property, in view of the idea then prevail-ing among the native Hawaiians as to the rights of Kings and

partly also because the King was supposed to be busied with the affairs of state?

In *Harris v. Carter*, 6 Haw. 209, Associate Justice Judd said: "I understand that there is no prescription against the State * * * but the King as an individual cannot claim this immunity. *Nullum tempus occurrit regi* means the King as representing the Government and as guardian of the lands of the state." Of this it is to be observed that it was the opinion of a single judge,—entitled, no doubt, to weight—and more particularly that the statement was obviously made with reference to the maxim only. The constitutional provision, so far as the decision shows, was not called to the judge's attention nor did he refer to it in any way.

In my opinion, the title of the King was, until July 7, 1887, the date of the adoption of a new Constitution in which the provision in question did not appear, incapable of being divested or extinguished by adverse possession or by the operation of the statute of limitations, and the statute did not run against him during that time.

The exceptions should be sustained and a new trial ordered.