## IN THE MATTER OF THE APPLICATION OF STATE OF HAWAII TO REGISTER TITLE TO REAL PROPERTY SITUATE AT MOILIILI, WAIKIKI-WAENA, CITY AND COUNTY OF HONOLULU, STATE OF HAWAII.

No. 4414.

February 2, 1967.

RICHARDSON, C.J., CASSIDY AND WIRTZ, JJ., AND CIRCUIT JUDGE OKINO IN PLACE OF LEWIS, J., DISQUALIFIED, AND CIRCUIT JUDGE MONDEN IN PLACE OF MIZUHA, J., DISQUALIFIED.

OPINION OF THE COURT BY WIRTZ, J.

This is an appeal from the decree of the land court entered in Land Court Application No. 327, registering title in the State of Hawaii to a 74,530 square foot parcel (1.73 acres) of land in Moiliili, Waikiki, Oahu, claimed as a schoolhouse site under School Grant No. 27, Royal Patent No. 27, pursuant to the "School Lands Act of 1850." Respondent-appellant, the Minnie Becker Trust Estate,[1] claimed title to a 14,885 square foot portion thereof as being a part of the Ili of Maulukikepa granted to Kalama and Nakookoo under the *Mahele,* or land division of Kamehameha III, whose title was confirmed by Land Commission Award Nos. 5240 and 5364, and acquired by the respondent by mesne conveyances through an unbroken chain of title from the awardees.[2]

In 1848, pursuant to the *Mahele* or land division of Kamehameha III, Kalama and Nakookoo acquired the Ili of Maulukikepa located in Waikiki on the Island of Oahu.

On July 9, 1850 there was enacted into law a Hawaiian statute commonly referred to as the "School Lands Act of 1850," the pertinent section thereof providing that:

"7. All sites for school houses and houses for public worship, now occupied and in use, and not owned by private parties; and all lands connected therewith, granted either by the government, or by individuals, chiefs or landlords, with a view to promote the interests of education or religion, shall be reserved as government property, devoted to the purposes above mentioned; the amount of lands reserved for such sites however not to exceed two acres in each case; and in

[1] Respondent-appellant was substituted, by stipulation, in the place and stead of its predecessors in interest of the 14,885 square foot portion of the school lot sought to be registered by the original respondents, Kauhaeku Lani, Mary A. Lopes and Henry Silva.

[2] Another respondent, Solomon Kauai, claimed title to all of the land sought to be registered but was defaulted in the land court proceedings. Consequently, the title to the balance of the schoolhouse site sought to be registered is not in dispute under this appeal.

case the adjacent lands are sold or leased, such land shall not be included." II R.L.H. 1925 at 2184.

On December 23, 1850, the Hawaiian Privy Council by Resolution 2 appropriated certain lands by name "for the general purposes of education on the islands." The list of affected lands did not include the subject property, except insofar as the general concluding language of the resolution is applicable:

"And all lands now occupied by the Government Schools, and known as having been appropriated to their use, either by individual chiefs or by the Government."

On February 6, 1852, J. W. Makalena, a government surveyor, prepared a description, together with a sketch thereof, of a parcel of land comprising 1.74 acres, entitled: "Survey of School Lot and Designation as School House site," and referred to as School Grant No. 27. On the bottom thereof, there is a notation[3] in Hawaiian dated November 3, 1854 and signed by Keoni Ana (John Young) and R. Armstrong (Minister of Public Instruction) apparently made pursuant to Section 2[4] of the "School Lands Act of 1850." A copy of this survey was filed in the Land Book, Department of Public Instruction, which is in the custody of the Survey Office. Makalena's description is by metes and bounds of an area located in Waikiki-*waena* (middle of the then extensive District of Waikiki), and is tied down only in that the point of beginning thereof is referred to as being adjacent to the boundary of "Hawaii."[5]

---

[3] This notation has been translated variously as "we two hereby consent that this school house site be kept by the government," and as "we agree that the title to this school lot is in the government."

[4] "2. It shall be the duty of the minister of public instruction, in consultation with the minister of the interior, to designate said lands, which designation when approved by the privy council, shall be valid." II R.L.H. 1925 at 2184.

[5] In the 1917 hearings in the land court, government surveyor H. B. Newton testified flatly that Makalena's survey was not "tied down."

On March 12, 1855, the Board of Commissioners to Quiet Land Titles confirmed the title to the Ili of Maulukikepa in Kalama and Nakookoo by Land Commission Award Nos. 5240 and 5364. On April 8, 1857, upon payment of commutation, Royal Patent No. 3579 was issued to the awardees covering the 13.53 acres of the Ili. It is admitted that the school lot claimed, and sought to be registered, is wholly within the boundaries of the Ili of Maulukikepa as covered by Land Commission Award Nos. 5240 and 5364 and described in Royal Patent No. 3579. Neither the Royal Patent nor the Land Commission Award of the Ili of Maulukikepa contain any language of exception or reservation of any schoolhouse site.

In 1859 another statute pertaining to school lands, and more particularly the disposition thereof, was enacted. In modifying Section 7 of the "School Lands Act of 1850," Section 752 of the 1859 Act provided:

"Sec. 752. All sites for school houses and houses for public worship, not owned by private parties, societies or corporations, and all lands connected therewith, which have been granted by or to the government, for the purpose of promoting the interests of education or religion, shall be reserved as government property, so long as they are devoted to the purposes for which they were granted, and shall be under the charge and control of the Board of Education; and in case they shall cease to be used for the purposes for which they were granted, for not less than one year, they shall revert to the original grantors, or their representatives. In all cases where lands are sold or otherwise disposed of, the sites for school houses and houses for public worship, shall not be included in such sale or disposition." II R.L.H. 1925 at 2185-2186.

This statute with the provision for reverter upon nonuse

remained in effect for 37 years until repealed in 1896.[6]

On May 6, 1878, J. F. Brown, a government surveyor hired for the purpose of locating the schoolhouse site in question, made a "Plan of School Land—Moiliili," computed the area surveyed as containing 1.73 acres, and fixed the schoolhouse site as surveyed by J. W. Makalena as being wholly within the Ili of Maulukikepa.[7]

Sometime between December of 1880 and March of 1881, S. E. Bishop was commissioned by the government to survey the District of Waikiki[8] for the purpose of locating *kuleana*[9] and other boundaries therein. The resulting survey map, filed with the State Survey Office as Registered Map No. 1398, shows the presence of walls and fences in the area of the school lot in question but the outline of the school lot itself, as plotted by Brown, was superimposed thereon by someone other than Bishop.

Both the Brown survey of 1878 and that of Bishop in 1881 show the lower or *makai* (southerly) portion of the school lot along its claimed southerly and easterly boundaries to be physically separated by fences and stone walls from the balance of the school lot upon which the schoolhouse was located.[10] Within this segregated area was also

---

[6] The Act to regulate the Bureau of Public Instruction passed in 1864, although repealing Chapter 10 of the Civil Code of 1859 including the above quoted Section 752, re-enacted this provision in Section 35 thereof. II R.L.H. 1925 at 2186-2187.

[7] Upon completing this survey however, he found he had totally excluded the schoolhouse physically located near the *mauka*, or northwesterly, boundary of the Ili so he arbitrarily moved his plot of the lot boundaries 68 feet in a *mauka* or northwesterly direction and 25 feet to the southeast.

[8] The District of Waikiki included all of the land extending from Waikiki Beach *mauka* (northward) towards and including Manoa Valley. The school lot in question was part of the district located in the central portion thereof and known as Waikiki-*waena* or middle Waikiki.

[9] A *kuleana* was a smaller portion of land within the domain (*ahupuaa* or *ili*) of a chieftain (*konohiki*).

[10] The existence and location of the stone walls are corroborated, to some extent, by the testimony of former pupils of the school (*kamaaina* witnesses) *circa* 1850 at the schoolhouse site in question.

shown an unidentified building of a substantial character. This is the area of 14,885 square feet claimed by respondent not to be within the schoolhouse site claimed and sought to be registered by the State in the land court proceedings below.

On September 30, 1882, Royal Patent No. 27 was issued by King Kalakaua granting the school lot in question to the Board of Education, described by metes and bounds as shown by the Brown survey.

In 1902, government surveyor Harvey made a survey of the area in question for the purpose of subdividing the Ili of Waiaka which adjoined the Ili of Maulukikepa.

In 1905, one of the predecessors in title to respondent notified the Department of Public Instruction that the fencing off by the Department of a portion of the 14,885 square feet claimed by respondent in accordance with some new unidentified survey amounted to a taking of at least one-half of the property she inherited from her father who had acquired the same by deed in 1877 and had died in possession. In September of 1913, the Superintendent of Public Instruction reported the removal of a fence by "a man named Silva" along the *makai* (southerly) side of the school lot and of a fence by an unknown Hawaiian man. H. E. Newton, who made the survey and plotted the school lot for the land court application of the State, noted the removal between September 18, 1913 and October 3, 1913, of the fence along the *makai* (southerly) boundary of the school lot and its relocation some forty-two to fifty-five feet *mauka* (to the north) coinciding with the *mauka* (northerly) boundary of the 14,885 square foot portion of the school lot claimed by respondent. The fencing of the other part of the 14,885 square foot portion of the school lot claimed by respondent and located in the lower *makai* corner does not appear to have been disturbed by the school authorities in 1905.

On May 6, 1915, the then Territory of Hawaii filed in the land court its application to register title to the entire school lot, comprising 74,530 square feet, or approximately 1.73 acres, as shown by the survey and map of Newton based on Brown's survey of 1878. As seen, answers[11] were filed by respondent's predecessors in title, who between them claimed title to the 14,885 square foot portion of the school lot now claimed by respondent, who had been substituted as party-defendant or respondent by stipulation entered on March 4, 1963[12]. On September 3, 1915, the title examiner appointed by the land court recommended in his report that the Territory's claim of title in this proceeding (Land Court Application No. 327) should be denied because of the incapability of "tying down" or definitely establishing the location of the parcel granted by Royal Patent No. 27 to the Board of Education.

Beginning on April 18, 1917, and during the succeeding and intermittent days, hearings[13] were held before the then presiding judge of the land court wherein testimony was taken of persons (*kamaaina* witnesses) who had lived in the vicinity of the school lot and had attended the school *circa* 1850. From this evidence it appears that there had been a school on the school lot but just when it first came into being was the subject of conflicting testimony. Testimony was also given by H. E. Newton, assistant government surveyor, who had prepared the map filed with the instant application.

[11] The answer of Soloman Kauai claiming title to the entire school lot can be ignored insofar as this appeal is concerned. See footnote 2, *supra.*

[12] On June 14, 1927 Gustav Julius Becker, predecessor in title of respondent, filed Land Court Application No. 791, seeking to register title, among other lands, to the 14,885 square foot portion of the school lot herein sought to be registered by the State and in dispute in these proceedings. The State filed its Answer in Land Court Application No. 791 claiming title to the 14,885 square foot parcel of land in dispute. Land Court Application No. 791 is still pending.

[13] The transcript of these hearings was put in evidence by stipulation when hearings on this land court application were resumed before the present judge of the land court on March 7, 1963.

Since the hearings held in 1917, the instant application lay dormant for almost forty-five years until it was revived as a result of eminent domain proceedings filed by the City and County of Honolulu on April 3, 1962[14], for the purpose of acquiring additional land for Kuhio Elementary School, Honolulu, Hawaii, wherein, under paragraph 5 of the complaint, it was alleged that parcel 10 of the proceedings, comprising 14,885 square feet, was in dispute between the State and respondent herein.

Pursuant to the suggestion of the presiding judge in the eminent domain proceedings that title to parcel 10 be litigated in the land court, the parties hereto resumed hearings in the instant application on March 7, 1963. After trial, the land court, on November 5, 1963, entered the decree registering title to School Grant No. 27, which included the disputed area of 14,885 square feet, in the State, and which is the subject of this appeal.

The sole specification of error raised under this appeal is as follows:

"The Land Court below erred in granting the application of the State of Hawaii herein to register title to the entire 74,530 square foot parcel claimed by the Applicant-Appellee, and such application should have been denied at least to the extent of the 14,885 square foot portion thereof claimed by the Respondent-Appellant, the Minnie Becker Trust Estate."

The State contends that "there is presented to this Court no error concerning any question of law nor any error concerning evidentiary matters and rulings by the lower court" under this specification of error. Urging that this specification is deficient under Rule 3(b)(4) of this court in not setting "out separately the particulars of each error intended to be urged," the State asks dismissal of the appeal.

---

[14] *City and County of Honolulu* v. *Willson Carr Moore, Jr.,* Civil No. 9491, First Circuit.

It should be noted that the specification of error above set forth and relied on by respondent in this appeal is almost identical with, and appears to have been patterned after, the specification of error[15] relied on by the State in its successful appeal from the land court's decree in No. 4234, *Application of Robinson* (decided December 5, 1966), on page 429, *ante*. The two specifications differ only in detail as a result of the differences in the nature of the respective land court applications. Under these circumstances we are not disposed to reject this appeal on grounds of the deficiency of the specification of error.

An analysis of the opening brief discloses that the land court's findings of fact and the conclusions of law flowing therefrom have all been challenged. Respondent-appellant has taken issue with the finding that the State had impliedly reserved title to the school lot in question; that the State had not ceased to use the lot for a schoolhouse site; that the school lot was within School Grant No. 27 as surveyed by Makalena.

The answering brief met the challenge and the resultant issues were thoroughly briefed and argued. The State, as appellee, can hardly now say that it was misled or prejudiced by the alleged insufficiency of the specification of error. Nor can this court complain of more than inconvenience in view of *Robinson, supra. Cf., Watumull* v. *Tax Comm'r.,* 34 Haw. 84, 86.

In this land court application, the State, as the petitioner has the burden of proof in establishing its title to the entire school lot sought to be registered. *Re Land Title, Wong,* 47 Haw. 472, 477, 391 P.2d 403, 406. As against the respondent, the State must prove its title to the disputed 14,885 square foot portion of the school lot, and not vice versa. There is no valid reason why that proof should

---

[15] "The court below erred in denying the claim of the State for reservation of mineral and metallic mines in its favor in the Land Court Decree pursuant to such reservations being made in the royal patents."

not be, as in other civil actions, by a preponderance of the evidence. But this measure of proof is to guide the judge of the land court and "it is not our function to try the case de novo." *Re Land Title, Wong, supra,* 47 Haw. 472, 478, 391 P.2d 403, 406.

The scope of appellate review of land court proceedings has not yet been decided, as the Hawaii Rules of Civil Procedure do not apply to such proceedings except in certain situations not here pertinent. H.R.C.P., Rule 81(a), (d) and (f). In *Wong, supra,* this court recognized, without answering, the question whether appellate review of a land court proceeding is governed "by the 'clearly erroneous' rule enunciated by H.R.C.P., Rule 52(a), or by the more restricted rule applicable to review on writ of error." Under the "clearly erroneous" rule, unless the appellate court is "firmly convinced that a mistake has been made by the trial court, its findings must stand," and a "choice between two permissible views of the weight of the evidence is not 'clearly erroneous.'" *Re Land Title, Wong, supra.* The "more restricted rule" referred to in *Wong, supra,* has been stated as follows: "whether there is evidence of that substantial character amounting to more than a scintilla to support the findings of the judge or the jury." *Land Title, Waimalu,* 33 Haw. 832, 834.

There still is not presented a pressing need to resolve this question of appellate review of land court proceedings. Here, the question of the credibility of witnesses, inherent in the "clearly erroneous" rule, was not the determining factor in the land court judge's findings of fact. The only testimony heard by him at the final hearings in March of 1963, was hardly of the character to admit of controversy. The testimony of the *kamaaina* witnesses taken in April of 1917 was not heard by him. A transcript of the *kamaaina* testimony was instead received in evidence by stipulation. The remaining evidence was all documentary in nature. Consequently, in reviewing this pro-

ceeding, the more restricted rule applicable to review on writ of error, and which would be most favorable to the appellee, is more appropriate than the "clearly erroneous" rule.

In support of its title to the school lot, the State claims that the existence of a schoolhouse on the premises in 1850 gave rise to an implied reservation and exception in favor of the government of a schoolhouse site by operation of the "School Lands Act of 1850" upon the filing of the Makalena survey[16] of School Grant No. 27 in the Land Book, Department of Public Instruction, with the designation of same by the Minister of Public Instruction, in consultation with the Minister of the Interior, the approval of the privy council thereof, and the issuance of Royal Patent No. 27 under the doctrine of *Knudsen* v. *Board of Education,* 8 Haw. 60, 65, 66, wherein it is stated:

"*Omnia praesumuntur solenniter esse acta.* 'All acts are presumed to be rightly done.' The survey of the site for the schoolhouse, made regularly according to the Statute of 1850, while it was in force, is presumptive evidence, first, of the fact that the site was in use as such when the Act was passed, and, second, of the fact that it had been granted for that purpose by its owner, the King.[17]

"At this lapse of time, when nearly all the actors in these transactions are dead, we are authorized to infer that the site in question had been taken for a schoolhouse, and was used and occupied as such when the Act of 1850 was enacted. This presumption is reinforced by positive testimony that at some period pre-

---

[16] That the Makalena survey covers the land in question here may well be disputed in view of Brown's arbitrary relocation of the plot to fit the physical facts due to the fact that Makalena's survey was not "tied down." However, a factual determination is rendered unnecessary as will be seen.

[17] Here, the King was acting in his capacity as a "private party" and landowner and not as the government.

vious to 1853 a grass schoolhouse had been built on the lot and was occupied as a public school, and by the fact that it had been used and occupied as a site for a schoolhouse thereafter and until 1886, when the house was removed by plaintiff."

In opposition to this claim of title by the State, the respondent-appellant distinguishes *Knudsen, supra,* principally on the grounds that the question in *Knudsen, supra,* "involved the effect of [a] private conveyance upon the rights of the government who had no privity to the lease contract whatever" while "in the instant case it was the government itself (acting by and through its legislatively appointed Land Commission) which granted the whole of the Ili of Maulukikepa to private persons without express reservation of any government parcel therein," contending that "the implied reservation theory relied upon by the court in *Knudsen* * * * simply does not apply where the written indicia of title is not a lease between private parties, but rather an award after judicial determination by the Land Commission." In relying upon the fact that the Land Commission Award and the Royal Patent issued thereon to Kalama and Nakookoo were both silent as to any reservation and exception of a school lot located within the Ili of Maulukikepa, respondent contends that title to the school lot passed with the award and patent under the principles adduced in *In re Kakaako,* 30 Haw. 666, and wherein it was stated that an award of the land commission, which was not appealed from as permitted by law, is final and conclusive[18].

---

[18] Actually this court in *Kakaako, supra,* affirmed the decree of the land court denying the application of the government to register title on the grounds first, of failure of proof that the disputed land sought to be registered was the same land allegedly reserved to the government, and secondly, that the legislative act reserving certain land for government use had been repealed prior to the Land Commission Award to a private party.

*Kakaako, supra,* merely reaffirmed the well-settled rule that a Land Commission Award is not subject to collateral attack regardless of the nature of the claimed invalidity of the award early established in *Kukiiahu* v. *Gill,* 1 Haw. 90, 91 and *Bishop* v. *Namakalaa,* 2 Haw. 238, 240.

Factually, the respondent-appellant denies the existence of a schoolhouse on the school lot *circa* 1850, but does admit that such a schoolhouse could have come into being *circa* 1860. The *kamaaina* testimony is far from clear on this question and is in fact somewhat confusing as to whether the witnesses were testifying to a schoolhouse on the subject school lot or on adjoining lands *mauka* (to the north). The best view of this evidence would indicate that a schoolhouse was constructed on the school lot shortly after the stone church (Kamoiliili Church) on the adjoining property *mauka* (to the north) was completed in 1854. However, the evidence could support either theory (of the State or the respondent) of the establishment of the school on the school lot, but it becomes unnecessary to determine the exact date the schoolhouse came into existence as it does not affect the result. For the same reason, we need not resolve the apparent conflict in the law between the existence of an implied reservation and the proscription against collateral attack of a Land Commission Award.

There can be no doubt that a school existed on the school lot *circa* 1860. How it came to be is another question. It was not unusual but customary for the landowners or chiefs to make a grant or appropriation of some of their lands for school sites. This is illustrated by the language used in Section 7 of the "School Lands Act of 1850," as well as in the concluding paragraph in the Privy Council Resolution 2 of December 23, 1850, set out above. Such a grant by the landowner or chief was presumed in *Knudsen* v. *Board of Education, supra,* 8 Haw. 60, 65-66. The only evidence in this record supports such a grant[19]. But even if this testimony is con-

---

[19] This was the testimony of one of the *kamaaina* witnesses (Solomon Kauai, the claimant of the entire school) to the effect that the parents of the school children complained to Kalama and Nakookoo about the danger of their children attending school where animals were roaming about and asked for some land of their *konohikis* (chiefs, Kalama and Nakookoo) so that their children would be closer to hand and protected against the roaming animals; and that their request was granted.

sidered untrustworthy, as contended by the State, there is nothing in the record to offset the presumption of such a grant indulged in by *Knudsen, supra*[20].

The State maintains that the "school site under School Grant 27 has been in use and in possession by the State from 1850 to the present; and appellant having the burden of proof of abandonment has failed to meet with this burden." In support, the State relies on the surveys of Makalena, Brown and Newton together with Bishop's Registered Map No. 1398.

The floating Makalena survey is inconclusive as it was not "tied down." When Brown made his survey he had to arbitrarily adjust the Makalena survey to conform to the physical facts. The Brown survey of 1878, which is the basis for all subsequent surveys, in making such adjustment showed the 14,885 square foot portion of the school lot claimed by respondent to be physically separated by stone walls and fences from the remainder of the school lot upon which the schoolhouse was located[21]. This physical segregation continued until 1905 when the fencing was removed and the government apparently took possession of the 14,885 square foot portion of the school lot only to relinquish it in 1913 when the fences were restored. The chain of title of respondent indicates that its predecessors

---

[20] Such a presumptive grant is not strange or novel when the *Mahele* of 1848 is considered, in effect, to be a "quitclaim agreement between the king and a chief or a *konohiki* with reference to the lands in which they both claimed interests." Chinen, *The Great Mahele*, 16 (1958). Taken in conjunction with the "School Lands Act of 1850," the result in this case, in effect, was the king quitclaiming to Kalama and Nakookoo the Ili of Maulukikepa, while reserving, or receiving in turn their quitclaim to him of their interest in the school lot. This interest in the school lot was converted into a defeasible interest by the "School Lands Act of 1859" creating a possibility of reverter in Kalama and Nakookoo.

[21] The *kamaaina* testimony indicated the presence of stone walls in *circa* 1850-60 located where the fences were later shown. This could indicate that Makalena's survey did not cover the school lot as now plotted and that the 14,885 square foot portion thereof had never been granted by Kalama and Nakookoo.

in title had continuously claimed title to and dealt with the 14,885 square foot parcel as owners.

In the light of this factual situation disclosed by the record, the respondent points to the reverter upon nonuser provisions of the "School Lands Act of 1859," set out above, which remained in effect until 1896. The pertinent portions of this Act are repeated for the sake of clarity. These were: "All sites for school houses * * * and all lands connected therewith * * * shall be reserved * * * *so long as* they are devoted to the purposes for which they were granted * * * and in case they shall *cease to be used* for the purposes for which they were granted, *for* not less than *one year,* they shall *revert* to the original grantors, or their representatives. * * **"* (Emphasis added.) II R.L.H. 1925, § 752 at 2185-2186.

While the record shows nonuse by the State during the period, at least, from 1878 to 1905, the State insists that no intent of abandonment has been shown, relying on *Haw'n Com. & Sugar Co.* v. *County of Maui,* 47 Haw. 486, 392 P.2d 302, *petition for rehearing denied,* 47 Haw. 587, 392 P.2d 834. But there the situation was different. The grant therein was expressly "for school purposes" with the option reserved in the grantor to repurchase should the grantee "cease to use the whole thereof for school purposes." There, this court construed the grant as requiring an abandonment which became a question of intent with the burden of proving such intent upon the asserter of same. As aptly stated by respondent, "there is no room to read into [Section 752 of the "School Lands Act of 1859"] any prerequisite of intent to abandon on the part of the government. It is merely a question of non-use, pure and simple. If the government fails to use the site for the schoolhouse site purposes for which it was granted for any period of one year while the statute is in force * * * then such reverted *automatically* to the original grantors."

*McDougall* v. *Palo Alto Unified School District,* 212 Cal. App. 2d 422, 28 Cal. Rptr. 37, cited in *Haw'n Com. & Sugar Co.* v. *County of Maui, supra.* The phrase "so long as" classically manifests intent that a possibility of reverter is being created. *Id.* at 432, 28 Cal. Rptr. at 43.

The State counters with the proposition that title by adverse possession cannot be acquired by private persons against the government, relying upon *Thurston* v. *Bishop,* 7 Haw. 421, 437, 438, wherein such persons were characterized as trespassers "squatting" on government land. This general rule was early recognized in Hawaii. See *Kahoomana* v. *Minister of the Interior,* 3 Haw. 635, 640. The respondent's predecessors in title did not consider themselves trespassers and their possession was not adverse in the usual sense, since they claimed possession by right under color of title. It is doubtful, in view of the *kamaaina* testimony as to the existence and location of the stone walls, whether the State ever had possession of the 14,885 square foot portion of the school lot until possibly in 1905. It is also questionable, in the atmosphere of uncertainty created by Makalena's floating survey and the arbitrary plotting of same by Brown, that the State ever had title to this 14,885 square foot parcel in dispute.

Be that as it may, it does not follow that the government cannot remove the protection given it by the general rule and permit the acquisition of title to government land by adverse possession or by possession akin to prescription. See 2 C.J.S., *Adverse Possession,* § 5b (1936) ; see also Annot., 55 A.L.R. 2d 554 (1957). The reverter upon nonuser provisions of Section 752 of the "School Lands Act of 1859," set out above, clearly provide that any title in the government to a schoolhouse site or "lands connected therewith" is automatically relinquished "to the original grantors, or their representatives" upon cessation of use. Certainly, possession by private parties is clear and convincing evidence of nonuser.

The remaining basis for the State's claim of title to the 14,885 square foot portion of the school lot in dispute is by adverse possession of the government. As seen, the record admits of no other acquisition initially by the government other than by grant. Nor does the record disclose any possession (adverse or otherwise) by the government of any portion of the 14,885 square foot portion of the school lot in question, its possession being limited to the larger portion of the lot upon which the schoolhouse was located, with the possible exception of the period between 1905 when the fencing separating the 14,885 square foot portion from the remainder of the lot had been removed until 1913 when the fences were restored. However, this period of eight years was insufficient to vest title by adverse possession[22]. Mere claim of title without express proof of actual possession for the statutory period is ineffective. *Fong Hing* v. *Yamaoka*, 31 Haw. 436, 439.

As above indicated, we have limited ourselves to a consideration of the State's title to the 14,885 square foot portion of the school lot in question under this appeal. From the foregoing we can only conclude that the judge of the land court erred in finding and concluding that there had been no cessation of use of the 14,885 square foot portion of the school lot in dispute by the State for the period of time provided by Section 752 of "School Lands Act of 1859[23]." In other words, we conclude that the land court erred in granting the application of the State of Hawaii to register title to the entire 74,530 square foot parcel

[22] At the time in question, the period of limitation was twenty years. *Kapiolani Estate* v. *Cleghorn*, 14 Haw. 330, 340. Even now it is ten years. R.L.H. 1955, § 241-30.

[23] Finding and conclusion of the judge of the land court:
"4. There may have been persons occupying portions of the school lot. But this would not cause the school use to be abandoned as to these portions. Nor can such occupancy ripen into rights in private parties against the sovereign by adverse possession. These occupants were squatters on public land. * * *"

claimed by the State, and such application should have been denied to the extent of the 14,885 square foot portion thereof claimed by the respondent-appellant, the Minnie Becker Trust Estate.

Reversed and remanded for entry of a decree in conformity herewith.

*Willson C. Moore, Jr.* (also on the briefs) for respondent-appellant.

*Andrew S. O. Lee,* Deputy Attorney General (*Bert T. Kobayashi,* Attorney General, with him on the brief) for applicant-appellee.

---

### DISSENTING OPINION OF RICHARDSON, C.J., WITH WHOM CIRCUIT JUDGE OKINO, IN PLACE OF LEWIS, J., DISQUALIFIED, JOINS

I respectfully dissent.

## I.

First, I disagree with the majority's conclusion that the sole specification of error is not deficient—no "more than inconvenience"—and that said specification of error merits consideration on this appeal. The State correctly concludes that "there is presented to this court no error concerning any question of law nor any error concerning evidential matters and rulings by the lower court." Appellant's specification of error is patently defective under Rule 3(b)(4) of this court, which rule states:

"(4) A specification of errors relied upon, which shall be numbered, and shall set out separately the particulars of each error intended to be urged. When the error alleged is to the admission or rejection of evidence the specification shall quote the grounds urged at the trial for the objection and the full substance of the evidence admitted or rejected, and refer to the page

number in the transcript where the same may be found."

The requisites of this rule were not followed. Appellant has especially failed to "set out separately the particulars of each error intended to be urged." As this court said in *Lyon* v. *Bush,* 49 Haw. 116, 118, 412 P.2d 662, 664:

"* * * A general assignment of error which does not 'set out separately the particulars of each error intended to be urged,' is insufficient and does not call for consideration by this court. Rule 3(b)(4), Rules of the Supreme Court. *State* v. *Kahua Ranch,* 47 Haw. 466, 468-69, 390 P.2d 737, 739; *Watumull* v. *Tax Comm'r,* 34 Haw. 84, 85-6; *Mid-Pacific Dress Mfg. Co.* v. *Cadinha,* 33 Haw. 456, 472-73; *Solomon* v. *Niulii Mill & Plantation, Ltd.,* 32 Haw. 571, 573-74; *Lemes* v. *Lusitana Society,* 32 Haw. 522, 525; *Smith* v. *Laamea,* 29 Haw. 750, 760."

It is my belief that the *Lyon* case, a 1966 decision, represents the thrust and trend of the case law in this jurisdiction.

In taking the opposite position—that the specification of error is not deficient—the majority cites, with proper reservation (*Cf.* citation), a 1937 decision—*Watumull* v. *Tax Commissioner,* 34 Haw. 84. The majority appears to rely on the following portion of the opinion:

"* * * A strict compliance with the rule is not required but a substantial and reasonable observance thereof becomes necessary for the twofold purpose of 1. enabling the appellate court readily to appreciate and understand the errors complained of, and 2. to enable opposing counsel to know what points are relied upon and what is urged as error in the action of the court." *Watumull* v. *Tax Commissioner, supra* at 86.

The above-quoted portion, however, must be regarded as dictum in light of the main emphasis of the case—and later

cases—as evidenced by the following passages:

"Equally objectionable and deficient is the brief of plaintiffs in error. It contains no specifications of error required by rule 3(b) of the supreme court. *This court has repeatedly called the attention of litigants and the bar to the requirements of this rule. * * * Failure to observe this rule may merit dismissal. * * ** This is a fault of recurring frequency and if persisted in the court for its own protection will be compelled to resort to punitive measures." *Watumull* v. *Tax Commissioner*, 34 Haw. 84 *passim*. (Emphasis added.)

The proposition—that the above-quoted portion of the *Watumull* case must be dictum—is borne out by a 1964 decision—*State* v. *Kahua Ranch, supra*. After quoting verbatim the portion relied upon by the majority, the court went on to say:

"It is elementary that all errors of the trial court which are not properly specified in the brief are deemed to have been abandoned or waived and consequently outside the scope of appellate review and will not be considered on appeal. 5 C.J.S., *Appeal & Error*, § 1322; 5 Am. Jur. 2d, *Appeal and Error*, § § 654, 693."

*Accord, Collins* v. *Shishido*, 48 Haw. 411, 405 P.2d 323. Finally, on March 23, 1966 this court held that the salient rule of law from the Kahua Ranch and Watumull cases was this: "A general assignment of error which does not 'set out separately the particulars of each error intended to be urged,' is insufficient and does not call for consideration by this court." *Lyon* v. *Bush, supra* at 118, 412 P.2d at 664.

The majority concludes: "The answering brief met the challenge and the resultant issues were thoroughly briefed and argued. The State, as appellee, can hardly now say that it was misled or prejudiced by the alleged insufficiency of the specification of error." I fail to follow this reason-

ing. The test for a sufficient specification of error, in view of the aforementioned cases, is not whether (through caution or chance) an appellee successfully discovered the "right" issues. This rewards an appellant for a sloppy and general assignment of errors, and forces the appellee to grope in the dark. For as the appellee has stated his quandary: "In an abundance of caution the Appellee State of Hawaii, has sifted through the brief of the Appellant in an attempt to discern wherein the Appellant complains of the ruling by the lower court and has presented its argument accordingly." It is fortunate that the appellee in this case picked the "right" issues. This is not my view of the appellate process.

The majority further states that because this court overlooked the appellant-State's specification of error in *Application of Robinson,* No. 4234, December 5, 1966—which specification was almost identical with the one in this case —therefore, we should overlook the appellant's defect here. This reasoning is not persuasive. There is an important and critical factual distinction between these two cases. In *Robinson,* the appellee did not brief or urge upon oral argument the alleged defect in the specification of error. In this case, appellee-State did so brief and argue the defect. That is the difference and the reason we could overlook the appellant-State's specification of error in the *Robinson* case, for as this court stated in *State* v. *Kahua Ranch, supra* at 470-71, 390 P.2d at 740:

> "Even were it possible to consider the lower court's ruling * * * as properly specified in that it was 'necessarily suggested' by the question involved under the specification of error considered, *it was nevertheless waived since it was neither urged nor argued in the briefs or upon oral argument. Godfrey* v. *Kidwell,* 15 Haw. 526; *Kavanaugh* v. *Johnson,* 290 Mass. 587, 195 N.E. 797. * * *" (Emphasis added.)

In short, what the appellee waived or forfeited in *Robinson*, the appellee-State did not in this case.

Therefore, to overlook appellant's defective specification of error, here, is a step backward from well established precedent. This court should not have considered this appeal.

## II.

Second, I agree with the State's "implied reservation" argument. The gist of the argument is that a school lot, established under the "School Lands Act of 1850," is excepted and reserved by law from a Land Commission award of an *ili*, or subdivision of land (within which *ili* the school lot is located), and for this reason there is no necessity of any express language of exception and reservation of such a school lot.

Appellant's contrary argument is that since the Land Commission award and the Royal Patent issued upon it were silent as to the reservation of any school lot located within the Ili of Maulukikepa, therefore, title to the school lot passed with the award and patent. It is to this complaint of the lower court's ruling that the State replies: "The answer of the State to this argument is that there was no necessity to have language of reservation and exception of the instant school lot in the award and patent for the Act of 1850 reserved and excepted the school lot." The State correctly draws its principal support from the landmark case of *Knudsen* v. *Board of Education*, 8 Haw. 60. In that case, the plaintiff, a private landowner—holder of a leasehold from Kamehameha III and another lease of the same land from the Commissioner of Crown Lands, both leases merging into one—presented the same argument as the present appellant. There the plaintiff argued that because the leases did not contain any express reservation of a school lot located within the leased land, title thus passed to him as lessee. The Supreme Court

held, at page 60, that "the site did not pass to the lessee of the land, though not specifically excepted." There was no necessity of reservation and exception of a school lot from the sale or lease of adjoining private or government lands because the law excepted and reserved the school lot. The "occupation by the Board of Education of the site, is presumptive evidence that the site was in use as such at the time the Act passed, and that it had been granted for this purpose by the owner of the land in which it is situated." *Knudsen* v. *Board of Education, supra* at 60. The court went on to state on page 64:

"The claim cannot well be made that when the owner of the land, be he King, chief or *private individual, or the Government,* out of which these sites were taken, *sold or leased* the land that the site passed by the conveyance or demise, unless expressly excepted. *It was not necessary to except them in the conveyance, for the law excepted them.* \* \* \*" (Emphasis added.)

The court further stated that school sites were reserved by law even without a Royal Patent being issued. The court said at page 66:

"We cannot find that the Royal Patent No. 39, which is proffered by defendant as its title, was issued, as far as plaintiff's rights are concerned, without authority of law and inadvertently. *The title of the defendant as a Department of the Government, in charge of the educational interests of this Kingdom, to this lot would be good as against plaintiff without the issuance of this patent to it.* But the patent was regularly issued in pursuance of an Act of the Legislature of the 13th August, 1880." (Emphasis added.)

Furthermore, I do not agree at all with the contention that this case is factually distinguishable from the *Knudsen* case. Appellant attempts to distinguish the *Knudsen* case since it involved a leasehold, whereas this

case involves a conveyance in fee simple. This attempt is specious for the *Knudsen* case answers this very point. The court in that case stated at page 62: "The question of paramount interest involved in this case is the nature and validity of the titles of a large majority of the sites for schoolhouses and churches throughout this Kingdom." Although the question in *Knudsen* pertained to a leasehold interest, that court went even further to state that whether the land adjoining the school site is private land or government land and *whether the land is conveyed in fee or leased,* there was no necessity of expressly reserving and excepting the school site for *the law excepted them. Knudsen* v. *Board of Education, supra* at 64.

As counsel for appellee has aptly pointed out, there is a striking parallel of the facts in the *Knudsen* case and the instant case: (1) In both cases a survey was made by J. W. Makalena, a surveyor employed by the Department of Public Instruction, and recorded pursuant to section 9 of the School Act of 1850 (section 755 of the Civil Code of 1859); (2) In both cases, Royal Patents were issued pursuant to an Act of the Legislature of August 13, 1880—in *Knudsen* Royal Patent No. 39 was issued in 1884 describing said lot as Lot 2 involving two acres; in our case, Royal Patent No. 27 was issued on September 30, 1882 for 1.73 acres; (3) In both cases the school lots were approved by the Privy Council on the same day—December 23, 1850—in accordance with paragraph 2 of the School Act of 1850; (4) In both cases there is *kamaaina* testimony regarding the existence of a school on the respective lands in question from around 1850.

Leading from the recital of these closely paralleling facts is the proposition that if there was no necessity of a reservation and exception in the *Knudsen* case, then the reasonable conclusion is that the same should be true in the case before us. It seems to me that both Royal Patents

for school lots issuing out of and approved by the same authorities should be similarly treated.

In short, I consider the *Knudsen* case to be factually similar, on point, and dispositive of the implied reservation issue.

### III.

Third, the Board of Commissioners to quiet land titles did not have the power to convey or award school lots.

The Second Act of Kamehameha III, hereinafter referred to as the Act of 1846, to Organize the Executive Departments of the Hawaiian Islands, Part IV, established a Department of Public Instruction and provided for the setting aside of land for school purpose. Chapter III of Public and Private Schools, Section VI thereunder, provides:

"The general superintendent of each school district . . . . Said general superintendent shall also have power to allot land, not otherwise appropriated, to the teachers and to the schools of their respective district . . . . Neither shall any land set apart by the general superintendent of the district in concert with the subagents thereof, be considered validly appropriated to that object until the said general superintendent shall have notified the same, its location, quality and quantity to the minister of public instruction, and received from said minister the certificate of the minister of the interior to that effect. *All land so set apart shall be registered as school lands in the interior department, and shall be considered as set apart to eleemosynary uses . . . .*" (Emphasis added.) Statute Laws 1845-46, pp. 206-07.

The Board of Commissioners to quiet land titles being established under Part I, Chapter II, Article IV of the same Second Act of Kamehameha III, the power and

limitation. of power of the Board must be construed in the light of the entire act.

The King and the legislative body were fully aware that for the operation of government, lands had to be set aside for the use by the various departments and agencies of the government, including the school department. For this reason it was intended that land set aside to the Department of Public Instruction under the Act of 1846 was not subject to the jurisdiction of the Board when it adjudicated claims against the government. It cannot be said that by the establishment of the Board to adjudicate private land claims it was intended that unless government lands set apart and used for government purpose were expressly excepted and reserved in awards of the Board, the government lost its lands. Such intent would be unreasonable and absurd and such construction of the powers of the Board would be arbitrary.

In construing a statute, the court looks to the history of the statute, the objects to be accomplished, the evils and mischief to be remedied in order to ascertain the intent of the legislature. *Territory of Hawaii* v. *Wah Chew Chang*, 42 Haw. 532, 541.

The object of the Act of 1846 was to organize the government and to allow people to own land in fee simple. The evil to be cured was to do away with a system of land tenure subject to the whim and pleasure of the King. The object was not to give away lands set aside for school purpose or government purpose, or allow persons to claim land set apart for government use.

Also, where a statute operates as a grant of public property to private persons, the statute is strictly construed in favor of the sovereign interest. *Slidell* v. *Grandjean*, 111 U.S. 412, 28 L.Ed. 321 (1884); *Coosaw Mining Co.* v. *South Carolina*, 144 U.S. 550, 36 L.Ed. 537 (1892).

Such construction would also be consonant with the

principles adopted by the Board. The pertinent parts of the principles read:

"* * * What is the nature and extent of that power which the King has bestowed upon this board? It can be no other than his private or feudatory right as an individual participant in the ownership, not his sovereign prerogatives as head of the nation. Among these prerogatives which affect lands, are the following:

"* * *

"4th. To provide public thoroughfares and easements, by means of roads, bridges, streets, etc., for the common good.

"5th. To resume certain lands upon just compensation assessed, if for any cause the *public good* or the *social safety* requires it.

"These prerogatives, powers and duties, His Majesty ought not, and ergo he cannot surrender. *Hence the following confirmations of the board, and the titles consequent upon them must be understood subject to these conditions.*" (Emphasis added.) II R.L.H. 1925, 2128, L. 1847, p. 81.

The statement by the Board that confirmation of land titles or awards were subject to the sovereign prerogative indicated that:

(1) The award of title by the Board excluded matters classified under sovereign prerogatives, even absent any language of exception and reservation.

(2) The Board did not have power to pass title to matters classified under sovereign prerogatives and any attempt to do so would be null and void.

Education and the support thereof by setting aside land for school purpose comes within the purview of sovereign prerogative of "public good" and "social safety." From early Hawaiian history the subject of education has been of prime concern of the government and the King.

Long prior to the Act of 1850, there were laws on public education. *Knudsen* v. *Board of Education, supra* at 62.

In view of the early laws of Hawaii setting aside land for the support of education in 1840, 1841 and 1846, these lands were reserved for the support of education and the Board, when it was established in 1846, did not have jurisdiction over these lands. Awards of lands and adjudications of claims by the Board were subject to lands reserved for school purpose. The court in the *Knudsen* case, in construing the powers of the Board and the early laws on the support of education, said:

"* * * The Land Commission was in active existence at the time this Act [Act of 1850] was passed and was not finally dissolved until March 31, 1855, and this Act may properly be regarded as in furtherance of the general scheme of settling land matters, as well as providing for the education of the people.

"The section of the Act of 1850 above quoted clearly contemplates that sites for school houses and houses for public worship were occupied and in use at the date of the act, and we have seen that this taking of land for such purposes was authorized by the early laws. These sites, as well as the lands connected therewith, were to be reserved as Government property devoted to the uses of education or religion." (8 Haw. at 64.)

Consequently, land set aside for the support of education comes within the purview of sovereign prerogatives for the "public good" or "social safety" under the principles adopted by the Board, hence awards of the Board were subject to these sovereign prerogatives.

What is included and omitted in Land Commission awards is not always the controlling factor in disputes over interests in land in Hawaii. In *Application of Robinson,* No. 4234, n. 7, Haw., December 5, 1966, the question on appeal was:

"Are the reservations of all mineral and metallic mines in favor of the Hawaiian Government (State of Hawaii) contained in the Royal Patents valid, when no such reservations were contained in the Land Commission Awards, and the Royal Patents were issued pursuant to the Land Commission Awards?"

This court answered yes.

This court also stated that:

"The power over government property thus bestowed on the Land Commission was not unregulated by law, and the Land Commission so recognized. It was within the framework of the governing laws that the Land Commission was to fix the 'terms' of the awards. This authority, conferred by section IX of article IV (S.L. 1845-46, p. 109), must be considered in the light of the section as a whole, whereupon it appears that leases as well as patents were to be issued by the Minister of the Interior to claimants 'pursuant to the terms in which the said board shall have confirmed their respective claims * * *.'

"* * *

"We recognize that the Land Commission had judicial powers. *State* v. *Hawaiian Dredging Co.,* 48 Haw. 152, 178, 379 P.2d 593, 608; *Kanaina* v. *Long,* 3 Haw. 332, 335; *Kahoomana* v. *Moehonua,* 3 Haw. 635, 640. No such powers were called into play here. The Land Commission simply decided who was entitled to a patent in the form prescribed by law. Accordingly, the reservations contained in the Royal Patents here involved were valid; the Land Commission Awards were subject thereto when made. No mention of the mineral rights was necessary in the Land Commission Awards since the reservation would be, as in fact it was, contained in the patents. The decree of registration should have provided for the notation of a

reservation as prayed." *Robinson, supra* at 12-3.

Proceeding from *Robinson, supra,* it could be reasonably said at least that no reservation was necessary in appellant's Land Commission Award in the instant case.

### IV.

Fourth, the school site under School Grant 27 has been in use and in possession by the State from 1850 to the present time. It is my view that the appellant had the burden of proof of showing non-use or abandonment and has not met this burden. See *Hawaiian Commercial & Sugar Co.* v. *County of Maui,* 47 Haw. 486, 392 P.2d 302, *petition for rehearing denied,* 47 Haw. 587, 392 P.2d 834. The majority places great emphasis and reliance upon the alleged inaccuracy of Makalena's survey. They say: "The floating Makalena survey is inconclusive as it was not 'tied down.'" This in their view weakens the State's contention that the school site has been in continuous use and possession from 1850 to the present time. This is not my view of the evidence. I fail to see where Makalena's survey "floats" about and is not tied down. Upon redirect examination of the government surveyor (Mr. Dunn) at trial, this was brought out on pages 85-6:

"Questions by MR. LEE:

"Q. Mr. Dunn, is it common that in the surveys of the old land commission awards where you have a description, the description is not tied down?

"A. In all, *I would say in all the old land commission awards the description is not tied down excepting that it calls for an adjoining owner.* Sometimes two adjoining lots made by the same survey would not have the same bearings and would not have the same distance but they would call for one another as adjoining owner.

*"Q. And the situation like the Makalena survey is very common?*

*"A. Yes, sir.*

*"Q.* In situations where the lot is not tied down and you want to tie it down, is it common practice for your office to find your bearing from the adjoining kuleanas?

*"A.* Not always from the adjoining kuleanas. In these cases here, I mean like using this one as an example, why he calls for Hawaii, he calls for Lauloa, he calls for Kahakai which are points which can be identified and working from there we can then take a school lot say, try to run a boundary of the school and fix his survey to see if it fits within the conditions called for, stone walls, fences, other conditions on the ground.

*"Q. And this is a common method used by the Survey Office to tie down on awards?*

*"A. I would say not only by the Survey Office. It was done by all surveyors."* (Emphasis added.)

Upon recross examination of Mr. Dunn by appellant's counsel, the common practice and custom of surveying during Makalena's day was not refuted. Appellant's counsel did not choose to rebut the practice. Thus if we accept appellant's view—that the survey "is tied down only in that the point of beginning thereof is referred to as being adjacent to the boundary of 'Hawaii' [the adjoining kuleana]"—then it appears that all the surveys of that period would be in jeopardy. I cannot accept this view.

Furthermore, I cannot agree with the majority view that this case represents the applicability of a possibility of reverter. Assuming, arguendo, that the School Lands Act of 1859 contains an intent to create a possibility of reverter, it nonetheless does not follow that it applies in

this case. In order to have a reversion, *the schoolhouse itself must "cease to be used."* See *Hawaiian Commercial & Sugar Co.* v. *County of Maui, supra.* The majority takes great care to show that from the surveys there was non-use but the trial court, after hearing the evidence of Mr. Dunn and Mr. Mann, and reviewing the 1917 evidence including all of the surveys, found that the State had continuously used the site as a school even if there was a period of time when the disputed parcel was physically fenced off by someone, be they squatters or otherwise. As long as a schoolhouse exists on the school site—and the majority concede that such was the case from 1860 to the present time—there is the use. The use of the schoolhouse is the use of the entire 1.73 acres which includes the disputed parcel. This was recognized by the School Act of 1850 when it placed a two acre limit on the lands set aside. This itself is a recognition of the need for adjoining lands to be part of the school site. There being such use, the possibility of reverter does not arise.

Even if there was non-use of the disputed portion of land from 1878 to 1905, this by no means manifests an intent to abandon the entire school lot—as long as the school building was located on the far corner of the school site.[1] The 14,885 square foot piece could not be abandoned

---

[1] The majority's first headnote is not clear. It states that the "School Lands Act of 1859 created a possibility of reverter which automatically restored the property to the original grantors upon non-use without the necessity of showing an intent to abandon the use by the government." However, in order to revert the defeasible fee to the grantor, an event must occur which terminates the defeasible fee in the grantee. 19 *Am. Jur.* Estates § 28, 31.

Assuming that a possibility of reverter was created, the question is whether the event has occurred. The event, of course, is abandonment. The majority indicates that "[i]t is merely a question of non-use, pure and simple." I do not think that the question is "merely" one of non-use or that it is "pure and simple." I do not think claims to property can be settled by basing it on simple non-use. Non-use is only one of the factors to be considered together with other pertinent evidence in determining abandonment. *Hawaiian Commercial, supra* at p. 486. "Abandonment is a question of intent * * *". *Dade County* v. *City of North Miami Beach,*

or not used in this sense unless the entire site was not used and there is no such evidence. *Hawaiian Commercial & Sugar Co.* v. *County of Maui, supra* at 493, 392 P.2d at 306, states:

"Where a claim is asserted, as in this case, that there has been a cessation of use because there has been no physical occupancy of a portion of the school premises, we hold that there must be sufficient evidence to show abandonment * * *. 'Abandonment is a question of intent and he who asserts it, has the burden of proving it. *Nonuse is only evidence that may or may not point to abandonment. * * *' Dade County* v. *City of North Miami Beach, supra* at 783. See *Board of Supervisors* v. *Newell*, 213 Miss. 274, 56 So.2d 689; *Clark* v. *Jones*, 173 Ore. 106, 144 P.2d 498. * * *" (Emphasis added.)

I find that the appellant has completely failed to sustain the burden of proof regarding abandonment, as well as non-use.

## V.

Finally, I agree with the State that title by adverse possession cannot be acquired by private persons against the government. Assuming, but not conceding, for argument's sake—that there was non-use (not abandonment) of the disputed area (14,885 sq. ft.), but that there was no reversion of the whole school lot—appellant still cannot take title by adverse possession. The Hawaiian case precedent is well established on this point. In *Thurston* v. *Bishop*, 7 Haw. 421, persons similarly situated as ap-

---

69 So.2d 780, 783 (Fla.) ; See *Board of Supervisors* v. *Newell*, 213 Miss. 274, 56 So.2d 689; *Clark* v. *Jones*, 173 Ore. 106, 144 P.2d 498, cited in *Hawaiian Commercial & Sugar Co.* v. *County of Maui*, 47 Haw. 486, 392 P.2d 302, *petition for rehearing denied*, 47 Haw. 587, 392 P.2d 834.

To avoid conflict with the *Hawaiian Commercial* case, I would interpret "non-use, pure and simple" to mean that there was non-use with the intent to abandon.

pellant's predecessors in title were characterized as tres-passers by "squatting" on government land. This court said in the *Thurston* case at pages 437-38:

"How can a mere claim to have his title to this land considered and adjudicated, be considered to have ripened into a perfect title at this late day, or rather into such a title as gives the devisees of his heirs-at-law a right of possession against the State?

There is no prescription against the State. *Lindsey* vs. *Miller's Lessee*, 6 Pet. 666. The Supreme Court of the United States say in this case: "It is a well settled principle that the Statute of Limitations does not run against a State. If a contrary rule was sanctioned, it would only be necessary for intruders upon the public lands to maintain their possessions until the Statute of Limitations shall run; and then they would become invested with the title against the Government and all persons claiming under it. In this way the public domain would soon be appropriated by adventurers. Indeed it would be utterly impracticable, by the use of any power within the reach of the Government, to prevent this result. It is only necessary, therefore, to state the case, in order to show the wisdom and propriety of the rule that the statute never operates against the Government.' This was adopted in *Kahoomana* vs. *Minister of Interior*, 3 Haw. 635."

*Accord, Harris* v. *Carter*, 6 Haw. 195, 209; *Kapiolani Estate* v. *Cleghorn*, 14 Haw. 330, 333; *Galt* v. *Waianuhea*, 16 Haw. 652, 658; see *In re Title of Kioloku*, 25 Haw. 357, 367. In the face of this well-established rule, the majority states: "The respondent's predecessors in title did not consider themselves trespassers and their possession was not adverse in the usual sense, since they claimed possession by right under color of title." I do not believe it is germane as to what the predecessors regarded themselves

as—whether trespassers or not. The question is: What was their legal status? The pertinent fact is that there was an implied reservation of the land, even if they had "color of title." The point is this—even assuming for the sake of argument that they had good title, the area in controversy was reserved by law to the State for use as a school lot. "School Lands Act of 1850," Vol. II R.L.H. 1925 at 2184; *Knudsen* v. *Board of Education,* 8 Haw. 60.

The majority goes on to say: "It is doubtful, in view of the kamaaina testimony as to the existence and location of the stone walls, whether the State ever had possession of the 14,885 square foot portion of the school lot until possibly in 1905." Again, this is not pertinent. The location of the stone walls or fence is not determinative. *The existence of the schoolhouse is the crucial fact.* The thrust of the majority view would appear to concede the continued use of the school lot only if the schoolhouse physically occupied the disputed area. The very nature of schools require open play areas surrounding the schoolhouses. These open areas may or may not be delineated by walls or fences. It would be too heavy a burden to ask the school authorities to be ever vigilant against adverse possession, by daily or weekly or monthly inspections of the boundaries. Their primary concern is to educate, not to inspect!

The majority concludes: "Be that as it may, it does not follow that the government cannot remove the protection given it by the general rule and permit the acquisition of title to government by adverse possession or by possession akin to prescription. See 2 C.J.S., *Adverse Possession,* § 5b (1936) ; see also Annot., 55 A.L.R.2d 554 (1957)." I cannot agree. Whatever may be the general case law reflected in the cited legal treatises in some jurisdictions in the United States—with respect to "possession akin to prescription"—the Hawaiian common law ever since the

1875 case (it will be noted, coming after the "School Lands Act of 1859") of *Kahoomana* v. *The Minister of the Interior, supra* at 640, is this:

"The theory of titles by prescription is, that the holding possession of an estate openly and adversely for a certain length of time, creates an inference that there was a grant from the adverse claimant or his ancestors or grantors, and the statute of limitations forbids the adverse claimant from setting up against this long continued possession, the fact that there was no grant.

"But as against the government, a grant cannot be presumed or inferred from long possession, in view of the law which required claimants to land to present their claims to the Land Commission for confirmation or rejection.

"* * *

"But it may be urged that the length of adverse possession since the closing of the Land Commission creates the inference of a grant. *To this the answer is complete. There is no prescription against the state. Quod nullum tempus occurrit regi. 'A state cannot be disseized.'* 2 Washburn, R.P., p. 525." (Emphasis added.)

*Accord, Thurston* v. *Bishop, supra* at 437-38; *Harris* v. *Carter, supra* at 209; *Kapiolani Estate* v. *Cleghorn, supra* at 333; *Galt* v. *Waianuhea, supra* at 658; see *In re Title of Kioloku, supra* at 367.

Nonetheless, let us assume for argument's sake only— as the majority maintains—that the "School Lands Act of 1859 * * * clearly provide[s] that any title in the government to a schoolhouse site automatically reverts 'to the original grantors, or their representatives' upon the cessation of use." This, however, is still irrelevant, for there has been no cessation of use, non-use or abandonment. See

*Hawaiian Commercial & Sugar Co.* v. *County of Maui, supra.* Since it is uncontroverted that a schoolhouse existed on the lot from 1860 to the present time, the possibility of reverter and consequent automatic reversion never comes into play. As we pointed out above, as long as a schoolhouse existed on the school lot, there was never any intention to abandon any portion of the school lot.

It is my opinion that we should affirm the decision of the trial judge. It has not been demonstrated to my satisfaction that his findings of fact and conclusions of law were clearly erroneous. This court said recently in *Re Land Title, Wong,* 47 Haw. 472, 478, 391 P.2d 403, 406:

> *"It is not our function to try the case de novo.* In the view most favorable to appellant we are limited on appellate review of a case of this nature to the determination of whether or not we deem that the trial court's findings were clearly erroneous. *Unless we are firmly convinced that a mistake has been made by the trial court, its findings must stand. Peine* v. *Murphy,* 46 Haw. 233, 377 P.2d 708; *Mitchell* v. *Branch,* 45 Haw. 128, 363 P.2d 969; *Dzurik* v. *Tamura,* 44 Haw. 327, 359 P.2d 164; *Miller* v. *Loo,* 43 Haw. 76. See also *United States* v. *Yellow Cab Co.,* 338 U.S. 338 * * *."

The trial judge was in the best position to adduce and evaluate the expert witnesses, their demeanor, and the voluminous exhibits in this case. In concluding otherwise, the majority has attempted a trial de novo, and yet, has not shown the trial judge's findings to be clearly erroneous. I cannot agree that the trial judge erred and would, therefore, affirm.