*W. C. Achi*, for defendant.

## V. KNUDSEN *vs.* THE BOARD OF EDUCATION.

APPEAL FROM BICKERTON, J.

HEARING, JANUARY 24, 1890.    DECISION, FEBRUARY 24, 1890.

JUDD, C.J., McCULLY, BICKERTON, DOLE, JJ.

(Mr. Justice Dole left for California after the hearing, before the decision was reached.)

The survey of a site for a school-house, made in pursuance of Section 7 of the Act of July 9, 1850, entitled " An Act to provide for the better support and greater efficiency of the public schools," and occupation by the Board of Education of the site, is presumptive evidence that the site was in use as such at the time the Act passed, and that it had been granted for this purpose by the owner of the land in which it is situated. The site did not pass to the lessee of the land, though not specifically excepted.

OPINION OF THE COURT, BY JUDD, C. J.

The averments in the bill are substantially as follows: On March 7, 1853, Kamehameha III., being owner of the land of Pokii, containing 270 acres, situate in the district of Kona, Island of Kauai, leased it to one John H. Gruben, for fifty years from the 1st July, 1852, for the rental of twenty-five cents per acre. On the 11th September, 1853, Gruben assigned one undivided half of the said leasehold premises to one Archibald Archer, who, with the administrator of the estate of said Gruben, assigned on the 1st October, 1858, all the said leasehold premises to the plaintiff, who has ever since held the said

demised premises under the said lease, except so far as said lease was merged in another lease of the same land, since become a part of the Royal Domain, made to the plaintiff by the Commissioners of Crown Lands, dated the 1st July, 1877, for thirty years ; that said Archer and Gruben entered and occupied the premises under said lease and assignment ; that a piece of land of about two acres in extent within the demised premises was, until recently, held by plaintiff, and it has become of especial value to plaintiff ; that the defendant is now interfering with plaintiff's use of said parcel and claims to be entitled to it by virtue of Royal Patent No. 39, dated in 1884, described therein as " Lot 2," and is against plaintiff's protest building a house thereon for a teacher's residence, and refuses to desist from so doing, or to accept another convenient site in said Pokii, which plaintiff offered to defendant without prejudice. That as far as plaintiff's rights in the land so patented are concerned, the said patent was issued without authority of law and inadvertently, and that defendant ought to be decreed trustee thereof to the use of plaintiff ; that plaintiff on taking the aforesaid leases had no notice of defendant's claim to said parcel.

The answer puts the plaintiff to proof of the first lease alleged in the bill ; admits the lease from the Commissioners of Crown Lands ; admits plaintiff's possession of Pokii, except the part described in lot 2 of said Royal Patent No. 39 ; and avers that the said lot has been in possession of defendant since 1853, and has been used by the Minister of Public Instruction and this defendant for public school purposes, under open and notorious claim of ownership, and that in 1855 defendant built a schoolhouse, and that a school-house has been maintained and a school conducted on this lot continuously until 1886, when plaintiff, who was then school agent, without authority of law or the consent of defendant tortiously removed the schoolhouse, and attempted to appropriate the lot to his own use ; that plaintiff has for twenty years last past resided near said lot, and during nearly all of the time been defendant's agent, and has been well aware of defendant's occupation of said lot. Defendant denies that said lot is or ever has been Crown Land, or that

the Royal Patent No. 39 was issued without the authority of law or inadvertently, and avers that the Royal Patent was based upon a designation and setting apart of said land on the 12th January, 1854, in accordance with an Act of Legislature of July 9, 1850, and of a resolution of the Privy Council passed in furtherance of the Act, on the 23d December, 1850.

BY THE COURT.

This case presents questions of such great importance to the community, as regards the interests of religion and education, as to require an extended investigation.

The question of paramount interest involved in this case is the nature and validity of the titles of a large majority of the sites for schoolhouses and churches throughout this Kingdom.

It must be borne in mind that upon the introduction of Christianity to this country and the conversion of large numbers of the chiefs and people to its principles, the chiefs became zealous patrons of education, and even before the establishment of the Government in its present form, edicts were enacted by the King and the council of chiefs to stimulate the people to learning and religion. Among the earliest of these is the "Statute for the Regulation of Schools," being Chapter 7 of the Old Laws, and passed by the King and chiefs on October 15, 1840. Its preamble is as follows : " The basis on which the Kingdom rests is wisdom and knowledge. Peace and prosperity cannot prevail in the land, unless the people are taught in letters and in that which constitutes prosperity. If the children are not taught, ignorance must be perpetual, and children of the chiefs cannot prosper, nor any other children;" therefore be it enacted, etc. The Act provides for the election of a school committee, and by it and the school agent the selection of teachers in the villages throughout the Kingdom. It provides for the securing of unoccupied land from which the teacher is to get his support, with a reversion of the land to the Alii ("King") translated in the English version, "Government", in case the teacher ceases to act as such. Provision is also made for the building of school houses by compulsory labor of the people.

A later Act of 13th May, 1842, made it a criminal offence for a land agent (konohiki) to refuse or withhold land when applied for by the General School Agent in accordance with the School Law.

The next statute was passed in 1846 in the general acts organizing the Government, Statutes of 1846 (vol. 1, p. 204). Among the provisions of this law is one that the general superintendent of each school "shall have power to allot land, not otherwise appropriated, to the teachers and to the schools of their respective district sub-divisions." "All lands so set apart shall be registered as school lands in the Interior Department, and shall be considered as set apart to eleemosynary uses," and the teacher for the time being had the use, occupancy and usufruct of the land, which passed to his successor. Section 14 of this act provides that the general superintendent of each district shall, under the direction of the Minister of Public Instruction, indicate the site for all schoolhouses.

We must bear in mind that it was not until the organization of the Commission to Quiet Land Titles. which was accomplished by the general statutes of 1846, the chiefs and people had any titles to land; and it was not until 1848 that the Mahele or great division was made, by which the interests of the King, chiefs and people in the lands of the Kingdom were separated, followed by the final act of the King ceding to the Government a portion of his reserved lands.

This review is necessary to the proper understanding of the Act of July 9, 1850, which repealed the School Law of 1846. Section 7 of the Act of 1850 is relied on by the defendant as the foundation of its title to the parcel of the land in question. It reads: "All sites for schoolhouses and houses for public worship, now occupied and in use and not owned by private parties, and all lands connected therewith, granted either by the Government or by individuals, chiefs or landlords, with a view to promote the interests of education or religion, shall be reserved as Government property, devoted to the purposes above mentioned; the amount of land reserved for such sites, however, not to exceed two acres in each case; and in case the adjacent lands

are sold or leased, such lands shall not be included." The Land Commission was in active existence at the time this Act was passed and was not finally dissolved until March 31, 1855, and this Act may properly be regarded as in furtherance of the general scheme of settling land matters, as well as providing for the education of the people.

The section of the Act of 1850 above quoted clearly contemplates that sites for school houses and houses for public worship were occupied and in use at the date of the act, and we have seen that this taking of land for such purposes was authorized by the early laws. These sites, as well as the lands connected therewith, were to be reserved as Government property devoted to the uses of education or religion.

The claim cannot well be made that when the owner of the land, be he King, chief or private individual, or the Government, out of which these sites were taken, sold or leased the land that the site passed by the conveyance or demise, unless expressly excepted. It was not necessary to except them in the conveyance, for the law excepted them. The State had taken these sites, not exceeding two acres in extent, wherever it was deemed desirable, throughout the Kingdom, by a quasi right of eminent domain, and reserved them as Government prop· erty devoted to the purposes of education, if they were sites of school houses, and of religion, if they were sites of houses of worship, and their alienation was forbidden. We are thus led irresistibly to the conclusion of law, that if the parcel of land in controversy was, at the date of the Act of 1850, occupied and in use as a site for a schoolhouse, it did not and could not pass to Gruben by the lease of Kamehameha III., of March 7, 1853.

It is urged that the title to the lot in controversy is not controlled by this Act, because sites for schoolhouses "owned by private parties" are exempted from the operation of the Act, and as Kamehameha III. owned the land of Pokii, he, as a "private party", would own the school site within its boundaries, unless a written grant of the lot from him be shown. We regard this argument as unsound. The sites of schoolhouses contemplated by the Act were those for the public schools sup-

ported by the nation, and the clause "and not owned by private parties" was introduced for the purpose of excepting private schools, of which there are a few instances, mainly in Honolulu, from the operation of the Act.   When the site was taken under the Acts of 1840 or 1846, for a public school, Section 7 of the Act of 1850 applies to it.

The Act required the sites of schoolhouses or houses for public worship then in occupation, referred to in Section 7, or thereafter to be taken for schoolhouse sites, referred to in Section 9, to be surveyed, as well as the lands connected therewith, and registered in a book, to be deposited in the office of the Minister of Public Instruction for the use of the King's Government, the expense of the surveys to be defrayed out of the avails of school lands—clearly showing that only public schools, supported by the State, were referred to.   We have intimated that the taking of the sites by the State was valid, even if out of lands then owned by the King.   The King is not specifically named in Section 7 of the Act, but the word "chiefs," which in the Hawaiian version is "na Lii," would include the King.   The King was in ancient times often called "Ke Lii Nui," "the great chief," and he is still called "Ke Lii." *Vide* Declaration of Rights of Kamehameha III. and Kekauluohi, of October 8, 1840, on page 5 of the Hawaiian version.

Having thus settled what we deem to be the law which should control this case, a brief review of the facts established by the evidence becomes necessary.   We find them to be substantially as follows: At some time previous to 1853, a grass schoolhouse was built on the lot in question and was occupied as a school until it was replaced by a wooden one in 1862.   A survey of this lot, of two acres in extent, made by J. W. Makalena, a surveyor employed by the Department of Public Instruction, dated the 2d of February, 1853, approved by the Minister of the Interior and the Minister of Public Instruction, January 12, 1854, is in existence on the files of the Land Office.   This schoolhouse site was used as such until 1886, when the schoolhouse was removed therefrom by plaintiff.

*Omnia praesumuntur solenniter esse acta.*   "All acts are presumed to be rightly done."   The survey of the site for the

schoolhouse, made regularly according to the Statute of 1850, while it was in force, is presumptive evidence, first, of the fact that the site was in use as such when the Act was passed, and, second, of the fact that it had been granted for that purpose by its owner, the King.

At this lapse of time, when nearly all the actors in these transactions are dead, we are authorized to infer that the site in question had been taken for a schoolhouse, and was used and occupied as such when the Act of 1850 was enacted. This presumption is reinforced by positive testimony that at some period previous to 1853 a grass schoolhouse had been built on the lot and was occupied as a public school, and by the fact that it had been used and occupied as a site for a schoolhouse thereafter and until 1886, when the house was removed by plaintiff.

Having come to these conclusions, it is unnecessary to dis-discuss many matters upon which the evidence is contradictory and uncertain.

We cannot find that the Royal Patent No. 39, which is proffered by defendant as its title, was issued. as far as plaintiff's rights are concerned, without authority of law and inadvertently. The title of the defendant as a Department of the Government, in charge of the educational interests of this Kingdom, to this lot would be good as against plaintiff without the issuance of this patent to it. But the patent was regularly issued in pursuance of an Act of the Legislature of the 13th August, 1880.

The decree of Mr. Justice Bickerton dismissing the bill is sustained.

*A. S. Hartwell,* for plaintiff.

*A. P. Peterson,* Deputy Attorney-General, for defendant.