IN THE MATTER OF THE APPLICATION OF
ROY CECIL KELLEY AND ESTELLE LOUISE
KELLEY, TO REGISTER TITLE TO LAND
SITUATE AT KAALAWAI, KAPAHULU, OAHU,
STATE OF HAWAII.

No. 4423.

SEPTEMBER 30, 1968.

RICHARDSON, C.J., ABE AND LEVINSON, JJ.,
CIRCUIT JUDGE OKINO FOR MARUMOTO, J.,
DISQUALIFIED, AND CIRCUIT JUDGE OGATA
BY REASON OF VACANCY.

OPINION OF THE COURT BY RICHARDSON, C.J.

On January 30, 1959, Roy and Estelle Kelley petitioned the land court to register title to certain lands situate in the general area known as Kaalawai, Oahu. The Kelleys claimed that the lands were conveyed to them through a chain of title dating back to a grant from the trustees of the Lunalilo Estate to one W. James Smith in 1885.

The question before this Court is whether one of the two parcels sought to be registered, hereinafter referred to as the disputed parcel, was conveyed to the Kelleys' predecessor in title, Smith, thereby giving Smith's successors good title. The State, appellant herein, argues that the disputed parcel was part of a public road to which it gained title in fee under the Highways Act of 1892. The Kelleys, appellees herein, argue that the parcel was never part of a public road, that the parcel was owned in fee by Smith, and that even if there were a road, the road was a mere easement that reverted to Smith's successors upon abandonment of the road by the public. The trial court, in a decision and a supplemental decision, found for the Kelleys.

## I.

In deciding whether the disputed parcel was conveyed, we must first review the history of the transactions involving the Smith property.

In 1881 the trustees were ordered by this Court to "sell and dispose" of all real estate owned by the late King Lunalilo. *In re Estate of His Late Majesty Lunalilo*, 4 Haw. 381, 382 (1881). The King, while a private citizen, had acquired the Iliaina of Kapahulu as his private lands during the Mahele of 1848. In accordance with the decision of this Court, the trustees set about to subdivide the iliaina. In the following year, Registered Map No. 1502, known as the "Survey of Kapahulu Lots" or the "Kapahulu Survey", was prepared. Admitted in evidence by the trial court, the map shows the subdivision of the Lunalilo property into two major units, parcels labeled Lots 1 to 37 and a smaller number of parcels in the southeastern portion of the iliaina

labeled Lots A to I. These latter lots were the original Kaalawai subdivision. Lot A was the most ewa of the lots, and Lots A through G were contiguous. (See sketch.) Lots A through G bordered on a strip of land bearing no designation, and the strip separated the makai boundaries of Lots A to G from the sea. The disputed parcel is part of this strip. Lots G and H were separated by the Government property, including a smaller strip of land that was contiguous to both the larger strip and Lot H. This smaller strip veered away from the seashore in a mauka direction. Lots H and I, at the kokohead end of the subdivision, were contiguous and had no makai boundaries delineated except the seashore.

In 1884, the largest of the lots labeled 1 to 37, Lot 36 (an area including Diamond Head crater), was sold to the Hawaiian Government. The Kaalawai subdivision was not included in this property. In the deed, the boundaries of the Government property were described as following a line "to the South West Corner of Lot A at sea shore * * *."[1] The next courses of the boundaries proceeded along the mauka side of Lots A to G, down to a "road at sea beach" between Lots G and H.

---

[1]The Lot A referred to here is not to be confused with Lot A referred to in appellant's brief. The Lot A here is the Lot A that was part of the original subdivision of the Kaalawai lots by the Estate. The Lot A in appellant's brief is the disputed parcel.

The deed also included the following habendum clause:

To have and to hold the granted premises [Lot 36] with all easements, privileges and appurtenances thereto belonging to the said * * * Minister of the Department of the Interior for and on behalf of the Hawaiian Government[,] his successors in said office and assigns forever, *excepting and reserving however a public right of way fifty feet wide along the sea beach and across the South Eastern portion of the said premises where the present road runs;* and also the privilege to the grantors and their successors and assigns, of using the sea beach adjoining the Kapahulu sea fishery for all purposes connected with the ordinary management of the said fishery. (Emphasis added.)

In 1885 Lots A to I were conveyed to various private purchasers. Smith bought Lots A and B. The deed transferring title to him stated that Lots A and B were bounded as follows:

* * * from the south west corner of this land *at the mauka side of the road near the sea,* the boundary runs by true meridian angles, north 14° 43' west 83 feet, and north 75° 24' east 397 feet and north 81° 16' east 282.5 feet along Lot 36 of the Kapahulu survey; south 47' west 150.5 feet along lot C, south 78° 49' west 307.5 feet [makai boundary of Lot B], and south 87° 59' west 339 feet [makai boundary of Lot A] *along the road to starting point* * * *. (Emphasis added.)

These boundaries delineated a six-sided parcel the makai boundaries of which were at the mauka side of the road. The last two courses connected the southeastern corner of Lot B to the southeastern corner of Lot A, and the southeastern corner of Lot A to the southwestern corner of Lot A, delineating two lines that were "at the mauka side of the road."

The deeds for Lot C, Lots D and E, and Lots F and G also described the makai boundaries of those lots as being lines connecting points "at the mauka side of the road."

The deed for Lot H described Lot H as being a quadrilateral lot the southwestern corner of which was "near the road by the sea." However, Lot H's makai boundary was "along the sea,"

not along a road. This description squares with the representation of Lot H on Registered Map 1502.

## II.

With the foregoing facts in mind, we consider the issue of whether a public road over the disputed parcel existed.

The trial court found that the larger strip of land that ran along the makai boundaries of Lots A through G and the smaller contiguous strip bordering Lot H were not related in any way to the 50-foot public right of way "along the sea beach and across the South Eastern portion of the said premises where the present road runs" described in the exception and reservation clause in the deed of 1884. Instead, the trial court held that the "present road" referred only to a road along the seashore across from the Kapahulu fishery, as delineated in Registered Map 1502, and that the road was solely for the purpose of access to the fishery.

We find that the trial court was clearly in error. The Kapahulu fishery lies off the *southwestern* coast of the land sold to the Government. The road mentioned in the habendum clause to the Government runs "across the *South Eastern* portion" of the Government's premises, the portion that borders the Kaalawai subdivision on the kokohead side and includes the smaller strip bordering Lot H.

The trial court made much of the fact that the deed of 1884 described the Government's land as running only up to "the South West Corner of Lot A at sea shore." The trial court interpreted this as meaning that the southwest corner of Lot A was at the high water mark, *i.e.*, on the shore line as indicated on Registered Map 1502, and that therefore no road was provided for along Lots A through G. At the same time, the trial court found from the evidence that the map was a subdivision plan of the trustees' property in and around Diamond Head, including Kaalawai. On that map, there is a definite strip of land set aside from Lots A through G, separating those lots from the seashore. Also, the southwest corner of Lot A is represented as not being on the shore itself, but about 50 feet inland. In the 1884 deed, the precise course up to the southwest corner of Lot A was "north

88° 50' east" from a previous point at seashore indicated on Registered Map 1502. This course, taken from that previous point, again shows that the southwest corner of Lot A is not on the seashore itself but about 50 feet inland. Thus, the very map that the trial court considered an accurate representation of the subdivision of Kaalawai belies the court's interpretation of "the South West Corner of Lot A at seashore."

The court's view is also contradicted by a map prepared by the original surveyor of the Kaalawai lots, M. D. Monsarrat, which the court admitted for the limited purpose of showing the boundaries of Lots A to G. This map indicates that the makai boundaries of Lots A to G excluded the strip that separated those lots from the sea. The course listed on the Monsarrat map for the makai boundary of Lot B is 78° 49'. This reading is synonymous with the course of 78° 49' in the deed of 1885 to Smith and is virtually synonymous with the course of 78° 50' listed as the mauka boundary of the disputed parcel on the map that appellees submitted to the land court in their application to register title. Thus, the disputed parcel claimed by appellees lies entirely in the strip excluded from Lots A through G.

Appellees themselves admit that the deeds of 1885 indicate that the strip of undesignated land along Lots A through G was used as a right of way from the early 1880's, if not earlier. They claim, however, that the strip was a private way only for access to and from the Kaalawai lots for the private purchasers and not for general public use.

Yet the deed of 1884 provides for a "public right of way" across the southwestern portion of the Government property and also across the "South Eastern portion * * * where the present road runs," and the deeds of 1885 exclude the strip from the property conveyed to the private purchasers, including Smith. The evidence shows that the present Diamond Head Road from Waikiki to Kahala had not been built at that time, and construction on that project did not begin until the early 1900's. It strains the imagination not to conclude that the public right of way extended along the Government property and along the Kaalawai subdivision and served as a primary means of travel between

Waikiki and Kahala from the early 1800's, if not earlier.

In the deed of 1884, the trustees, through the exception and reservation clause, also acknowledged that there was a road from Waikiki to Kahala that was already in existence and used by the public. The general view of an exception or reservation clause is that it is a means by which a grantor calls the attention of the grantee to an already outstanding right owned by a third party in the land being conveyed. 3 R. Powell, *Real Property*, § 407 (1967). In the habendum clause to the Government, the trustees conveyed to the Government Lot 36 "with all easements * * * excepting and reserving * * * a public right of way fifty feet wide along the seashore * * *." The "easements" referred to are the easements that were the Government's by its right as a landowner abutting the public right of way, such as the right of access for the Government. The exception and reservation clause, while transferring the fee title of the underlying roadway to the Government, which presumably would act as trustee of the public's interest, reserved a separate easement for the public to use over the 50-foot right of way.

The intent of the trustees was clearly to abandon the existing road from Waikiki to Kahala to the public. They used the terms "exception" and "reservation" to express the desire that the public right of way be considered an independent grant to the public, simultaneous with, but distinguishable from, the transfer to the Government. *Wickham* v. *Hawker*, 151 Eng. Rep. 679, 685 (1840).[2]

---

[2]This leading case is viewed as releasing the terms "exception" and "reservation" from the straitjackets that they had been placed in over centuries. The older view was that

> Theoretically, an "exception" exists when some part of the ownership of the grantor is never parted with; while a "reservation" is the term applicable when the instrument transfers all the grantor had but recreates in the grantor some specified interest with respect to land transferred * * *.
>
> Obviously an "exception" cannot be for the benefit of a third person, because, by definition, the expected interest remains uncovered in the grantor. The common law vigorously rejected reservations in favor of a third person. 6 R. Powell, *Real Property*, § 892 (1968).

However, in the *Wickham* case, it was held that a reservation could be considered the equivalent of an independent grant for the benefit of a third party. This position has been endorsed by the modern-day *Restatement of Property*:

In the deeds of 1885, the trustees went a step further. Although they could have conveyed the fee to the roadway to the abutting private purchasers and reserved public rights merely through an independent grant in an exception and reservation clause, they chose rather to exclude the highway altogether from the grants to the private purchasers. This is understandable in view of the fact that the Government can be relied upon to act as trustee of the public's interests in the roadway, whereas private purchasers cannot. In the habendum clauses of the deeds, the private purchasers were granted Lots A through G with "all easements, improvements and appurtenances" belonging to the land granted. As in the deed of 1884, these easements are the easements of the private purchasers as abutting landowners to a public road, such as an easement of access. There is no exception and reservation clause attached. The principal difference between the deeds of 1884 and 1885 is obvious—while the fee to the roadway was granted in the Government's case, the fee was not granted in the case of the private purchasers.

The inference from Registered Map 1502, the Monsarrat map for the limited purpose admitted, the deed of 1884 and the deed of 1885 — all admitted in evidence by the trial court — is clear. We hold that where maps and deeds clearly indicate that, as of 1885, a strip of land had been set aside for a public highway and that the highway was a primary route of travel for the public, such highway was at that time a public, not a private, highway. We find that there was a Waikiki to Kahala road, public in nature, stretching along the seashore of the Government property from the Kapahulu fishery up to Lot A, then along the seashore of the subdivision, separating Lots A through G from the sea and including the disputed parcel. The road then veered toward

---

[I]t is possible to convey an estate in fee to one conveyee and at the same time and by the same instrument of conveyance convey an easement in the same land to another conveyee. This result is not prevented by the fact that the conveyance of the easement is, in terms, a reservation to the person to whom it is conveyed. Thus, an easement may be created in C by a deed by A which purports to convey Blackacre to B in fee reserving an easement to C. *Restatement of Property* § 472, Comment a (1944).
In addition, over the years, the technical distinction between the terms "reservation" and "exception" have disappeared. *Sackett* v. *O'Brien*, 251 N.Y.S. 2d 863, 866 (1964).

Kahala on the Government property along Lot H and ran across "the South Eastern portion" of the Government land. This fin-de-siècle road was no doubt a far cry from the paved asphalt roads that we are familiar with today, but the fact remains that it was a public road.

## III.

Having determined that there was a public road, we consider the issue of whether the parcel was owned in fee by Smith.

The trial court found that the trustees intended to convey title to the road area for two reasons: (1) because Lot A reached down to the high wash of the waves and (2) because the better rule is that where a road has been established abutting a navigable body of water and on the margin of land completely owned by the grantor, the grantee takes to the further edge of the road. *Berger* v. *Town of Guilford,* 136 Conn. 71, 68 A.2d 371 (1949).

As we indicated above, the trial court's determination of the makai boundary of Lot A as being at the high wash of the waves was erroneous. The southwest corner of Lot A was not at the high wash of the waves; this was indicated by the two maps accepted by the trial court as being accurate representations of the boundaries of the lots. The deed of 1885 to Smith also described the southwest corner as being "mauka of the road" and not at the seashore.

We also find that the so-called better rule is not that at all. Rather, we find that, where a highway is used to describe a boundary in a deed, while the presumptions may be that a highway bordering on navigable water is included wholly within the conveyance and that a highway entirely surrounded by terra firma is included within the conveyance up to its midline, such presumptions do not arise where the evidence indicates that the grantor had no intent to convey what the grantee claims or that the grantor in fact did not convey what the grantee claims.[3]

---

[3]The theoretical basis for the presumption regarding a highway surrounded entirely by land is that such a highway is created when owners of two contiguous lots agree to create an easement at the common boundary of their lots, each owner giving up an equal amount of land while retaining the under-

This is the view taken by Mr. Justice Holmes in *Crocker* v. *Cotting,* 166 Mass. 183 44 N.E. 214 (1896), a case contemporary with the deeds of 1884 and 1885. Reviewing the evolution of the law regarding the use of natural monuments having widths, such as passageways, as boundaries, Holmes notes that the older view at common law was that where land being conveyed was described as being bounded "by a five-foot passageway," the conveyance excluded the passageway itself. He observes that a rival rule has slowly evolved that the mention of a passageway as a boundary is presumed to mean the middle of the way. However, such a rule is not an absolute rule of law "irrespective of manifest intention * * * but * * * merely a principle of interpretation, adopted for the purpose of finding out the true meaning of the words used." Where a deed contained "measurements and contents to a fraction of a foot" that excluded the passageway, the passageway itself was not conveyed to the grantee. *Id.* at 185-86, 44 N.E. at 215.

We adopted reasoning similar to Holmes' in *Wailuku Sugar Co.* v. *Hawaiian Commercial & Sugar Co.,* 13 Haw. 583 (1901), in denying grantee's claim to title to the center of a stream based on the language of a Land Commission Award which stated that grantee's parcel was "e pili ana me Kahawai [adjoining the stream]." The evidence revealed a definite starting point for the courses listed in the deed and courses and distances, which, if followed, delineated a plot that excluded the bed of the stream. We stated then that the rule that a grantor conveys to the middle of a monument having width was "at best one of construction only." *Id.* at 584. The two basic reasons for the rule are, first, to carry out the intent of the grantor and, second, to prevent harassment of those who would take title to a share of the monument in good faith. At the same time, we held that

* * * in spite of these considerations of policy * * * one who

---

lying fee thereto. The theoretical basis for the presumption regarding a highway bordering a navigable body of water and on the margin of land owned completely by one owner is that the owner himself gives up all of the land for the highway and intends to pass the title there to his grantee. Both presumptions and the underlying theories, see *Neil* v. *Independent Realty Co.,* 317 Mo. 1235, 1241-244, 298 S. W. 363, 365-66 (1927).

owns land to the centre of a stream or inclusive of the whole stream may convey to another the portion of such land extending to the bank only and exclusive of the bed of the stream. * * * [T]he presumption that the grantor intended to convey to the thread [middle] of the stream is prima facie only and may be rebutted, — in other words, if it clearly appears from the language of the conveyance or from any map or plat made a part thereof or, perhaps from other circumstances, that it was the intent of the grantor to convey only as far as and not including the bed of the stream [or any disputed parcel, for that matter], the deed will be so construed to carry out that intent. *Id.* at 584-85.

The applicability of the *Crocker* doctrine and, more particularly, the *Wailuku Sugar* case to the case at hand are patent. As in both cases, maps and deeds to private purchasers excluded the natural monument entirely. As in *Wailuku Sugar,* the deed of 1885 to Smith contained a definite starting point and described by courses and distances a parcel the makai boundaries of which ran along the mauka side of the road and excluded the road from the property conveyed. Following the rule in *Wailuku Sugar* that where it appears from a deed and other evidence, that the intent of the grantor was to convey only as far as a monument and not including it, we conclude that the deed of 1885 excluded the road. Thus, Smith was not granted fee title to any part of the road. Indeed, that is how Smith and his successors treated the road for many decades. Subsequent deeds in 1896, 1897, 1916 and 1943 to parts of Lots A and B bordering on the road excluded the road itself. The deeds described the makai boundary of the property as connecting two points mauka of the road, "along the road from Honolulu," or as being "along fence along North [mauka] side of Beach Road."

The *Guilford* case itself, *supra,* follows our findings with regard to the mere presumptive nature of the use of a highway as a boundary. Plaintiffs there derived title from town records dating back to the year 1729 which described the southerly (makai) boundary simply as being "a highway" that ran along the seashore. 136 Conn. at 75, 68 A.2d at 374. There were no

definite boundaries specified by course or any other description of the highway, although the evidence indicated that the makai boundary intended for the parcel conveyed was a boundary "southerly along the highway," *i.e.,* along the makai boundary of the highway. *Id.* at 76, 68 A.2d at 375. The court there concluded that since the evidence indicated an intent to convey up to and including the highway, fee title to the highway itself passed to grantees.

In the case at bar, we have precisely the opposite fact situation: the evidence in the form of deeds and maps indicates an intent *not* to convey up to and including the highway. Thus, the original grantee, Smith, did not obtain fee title to the disputed parcel over which the road ran, and his successors in title cannot register the parcel.

Appellees nevertheless argue that ownership belonged to Smith because the Estate had been instructed to "sell and dispose" of all of the real estate of King Lunalilo. This argument is thoroughly unconvincing. The trustees intended that the road from Waikiki to Kahala would be the property of the public. This intent was manifested in the independent grant of the road to the public over Government property, the exclusion of the road from the sale to the private purchasers, and the depiction of a strip set aside for public use in Registered Map 1502. We hold that where the evidence shows that a disputed parcel was deliberately excluded from the conveyance to a private purchaser, where there was already a much-used public road over the disputed parcel, and where the grantor was under court order to dispose of all of its real property, the grantor is deemed to have chosen purposely to have abandoned the parcel to public use as a highway.

## IV.

Finally, we consider the issue of whether the disputed parcel, upon falling into desuetude sometime after the present Diamond Head Road was built, passed in fee to Smoth's successors as abutting landowners although they did not own the parcel.

The general rule is that, in the absence of statute, fee title

upon abandonment of a road by the public reverts to the owner of the underlying fee or his grantees, not to an abutting landowner who does not own the underlying fee to begin with. *Neil* v. *Independent Realty Co.*, 317 Mo. 1235, 1244, 298 S.W. 363, 366 (1927). This squares with the common law doctrine that title to real property cannot be relinquished by abandonment. *W. F. Miller Co.* v. *Grussi*, 90 Conn. 555, 558, 98 A. 90, 92 (1916).

However, Hawaii is one of the few jurisdictions which have provided, at one time or another, for vesting the fee of a highway or road laid out by a private party and abandoned to the public in the central government. *In re American Sugar Co.*, 29 Haw. 820, 825 (1927). A Highways Act was passed for the first time in 1892. It declared as "public highways" all roads existing at the time of the passage of the Act, as well as those to be built thereafter, regardless of whether such roads had been built by the Government or by private parties which had dedicated, surrendered or abandoned the roads to the Government. L. 1892, c. 47, § 2 (now R.L.H. 1955, § 142-1). The ownership of all such "public highways" was to be in the Hawaiian Government in fee simple. *Id.* at § 5 (now R.L.H. 1955, § 142-2).

Appellees argue that the road that ran over the disputed parcel never became a "public highway" because it was never accepted by the Minister of Interior as required by Section 3 of the Act. A careful reading of the Act shows, however, that the Act prescribed a definite method of acceptance only for highways built by private parties and abandoned to the public after the passage of the Act. *Id.* at § 3. The statute does not require a formal act of acceptance for highways already existing at the time of the passage of the Act and, if originally private in nature, already abandoned to the public for a period of five years at the time of passage. *Id.* at § 4. Rather, such highways were declared "public highways" upon enactment of the statute itself. *Id.* at § 2.

We find among such highways the public road that had been laid out by the trustees and set aside by Registered Map 1502 and the deeds of 1885. The trustees abandoned the road in 1885 and had no intention of exercising any act of ownership thereafter because of this Court's order requiring them to dispose of

all of the real property of the Estate. They raised no claim of ownership until 73 years later when they sought to regain the land and register it in 1958.

Appellees also argue that our ruling in *In re Hawaiian Trust Co.*, 17 Haw. 523 (1906), governs this case. There a strip of land had been used as a highway by the public since 1853[4] and there was no evidence as to whether the owner had or had not exercised ownership since the passage of the Highways Act of 1892. We stated then that the Government could not acquire the fee in the highway "by a mere legislative enactment" such as the Act of 1892 and that there had to be evidence of actual abandonment before the fee to the highway vested in the Government.

That case does not support appellee for two reasons. First, the grantor in *Hawaiian Trust* had actual fee title to the land underlying the highway, whereas in the case at hand, appellee's predecessor in title, Smith, never had title to the land underlying the road. Second, while there was no evidence of abandonment in *Hawaiian Trust*, in this case the maps and deeds show that the grantor actually abandoned the road to the public in 1885. Thus, the fee title passed to the Government under Section 2 of the Highways Act.

Once having acquired the fee, the Hawaiian Government and its successors, including the Territory and the State,[5] could not be divested of title except by due process of law. L. 1892, c. 47, § 2. This provision of the Highways Act has continued in force until the present.[6] Therefore, although the public itself may have

---

[4]The report of *In re Hawaiian Trust Co.* in 17 Haw. 523 contains a typographical error at 524. The year "1893" in line three of the opinion should read "1853" instead.

[5]The laws of the Kingdom, not inconsistent with "constitutional principles," were adopted in a Proclamation by the Committee of Safety, January 17, 1893, *Laws of the Provisional Government of the Hawaiian Islands*, viii. Similar provisions by which existing laws, including the Highways Act of 1892, were adopted by succeeding governments were: Art. 92, *Constitution*, 1894, § 1 (from Provisional Government to Republic); c. 339 § 6, 31 Stat. 142 (from Republic to Territory); and P.L. 86-3, § 15, 86th Cong. (from Territory to State).

[6]In 1947, the wording of Section 2 of the 1892 Act was refined to distinguish between Territorial or federal-aid highways and county highways. Although the revision omitted the explicit stipulation that all public highways could be abandoned only by due process of law, there was no intention

abandoned the use of the road along the private lots and the disputed parcel, the Government retained the underlying fee.

While the Kelleys reserved the issue of adverse possession in the trial court, the conclusion that the Government acquired the fee precludes them, in any case, from raising the issue. There is no adverse possession against the sovereign, in this case the Government, unless expressly provided for by statute. *Galt* v. *Waianuhea,* 16 Haw. 652, 657-58 (1905) ; *cf., Territory of Hawaii* v. *Estate of Kealoha,* 43 Haw. 237, 238-39 (1959).

For the foregoing reasons, we conclude that there existed a public road of which the disputed parcel was a part, that the disputed parcel was not conveyed to Smith because it was abandoned to the public by the Lunalilo trustees, and that the disputed parcel was then made the property of the Government by the Highways Act of 1892 and has not been abandoned by the Government by due process of law. Therefore, the Kelleys do not have good title and cannot register the land.

Reversed and remanded for further proceedings consistent with this opinion.

*Andrew S. O. Lee,* Deputy Attorney General *(Bert T. Koba-yashi,* Attorney General, with him on the briefs) for the State of Hawaii, appellant.

*Charles W. Key (Lewis, Saunders & Sharpless)* for appellees.

---

on the part of the Legislature to allow for any abandonment of public highways by the governmental units of the Territory and the counties. This was indicated by the fact that the statute specifically provided that in the case of county highways, a highway could be abandoned by the public only by a formal resolution of the board of supervisors of the city and county or county wherein the county road was situated. Am. L. 1947, c. 142, pt. of s. 1.