UNITED CONGREGATIONAL AND EVANGELICAL CHURCHES OF MOKU'AIKAUA and HELANI, Plaintiff-Appellee *v.* HEIRS OF VICTORIA KAMAMALU, et al., Defendants, and STATE OF HAWAII, Defendant-Appellant

NO. 5654

JULY 17, 1978

RICHARDSON, C.J., KOBAYASHI, OGATA, KIDWELL, JJ., and CIRCUIT JUDGE SHINTAKU in place of MENOR, J., DISQUALIFIED

OPINION OF THE COURT BY RICHARDSON, C.J.

This appeal arises out of an action brought by the United Congregational and Evangelical Churches of Moku'aikaua and Helani (hereinafter, the United Churches) to quiet title to two church lots, situated in the North Kona district of the island of Hawaii at Holualoa and Kahalu'u. The heirs of Victoria Kamamalu and various other defendants either defaulted or disclaimed any interest in the lots. The only dispute at trial was between the United Churches and the State of Hawaii, defendant-intervenor. The trial court entered judgment in favor of the United Churches.

The two disputed lots lie within the ahupua'a of Holualoa and Kahalu'u. In 1848 both these ahupua'a were allotted to Victoria Kamamalu by the Great Mahele, but title was not conveyed until 1852, when Land Commission Award No. 7713, covering both ahupua'a, was issued to Kamamalu. This Award was by name only; the boundaries of the ahupua'a were not defined. The Award contained no clause excepting or reserving the two lots to the government.

The lots were the subjects of separate surveys made by J. W. Makalena on December 4, 1854 and subsequently recorded in the Land Book of the Department of Public Instruction. The survey of the Holualoa lot described it as a "School lot", while the Kahalu'u lot was described as a "School and Church lot". On September 30, 1882, King Kalakaua issued a Royal Patent which purported to formally grant the lots to the Board of Education. However, the trial court found that ac-

tual school uses of the lots continued for only about eight years, between about 1880 and 1888.

The trial court further found that the United Churches and its predecessors "have continually occupied and used the premises for well over a hundred years." The court found that the precise date when church activities began on the two lots was uncertain, but "the best evidence indicates that the mortar and stone [church] structures, the walls of which currently remain, were built in about 1861 or 1866 in Kahaluu and at Holualoa in about 1855." The court further found that church activities on the two lots have continued without interruption until the 1950's and 1960's respectively, since which times church uses have continued irregularly — the recent interruptions being partly or largely due to the State's insistence that it owns the lots:

> Church activity has continued at these two sites, without evidence of interruption for any significant period of time, up until 1967 in the case of Kahaluu and 1951 at Holualoa. Graveyard use was established at the two sites at some undisclosed date in the past and continues to the present time, the most recent burials at Kahaluu being Lucy Kaopua in the 1950's and her husband Naluahine in the 1960's, and at Holualoa that of Garnett Watson in 1959.

> In the case of the Kahaluu parcel, no serious gaps in use have been shown between the date of building of the Old Helani *Makai* Church in the 1860's and 1967 when the small wooden church was dismantled . . . . This action was taken partly because of the insistence of the State during the 1960's that it owned the property and the failure of the plaintiff (United Churches) and the State to arrive at any arrangement by which use, unchallenged by the State, could be continued . . . .

The "user" for church purposes of the Holualoa parcel is similarly established by the evidence. The existing church building was reportedly constructed in 1855. The church continued to operate up until about 1951 when the roof became unsafe. After that date, the congregation attended Mokuaikaua at Kailua, but at various and rare

occasions, up to and including the present, religious functions have been held at the premises.

While the major portion of the Holualoa site has not been consistently cleared and maintained since 1951, the cemetery area has been continually attended to and maintained to the present date by the plaintiff's membership. Permission was granted by the plaintiff to a religious group, the "Pilgrim Fellowship," in about 1971 to clear, maintain, and use the premises. In the case of Kahaluu, following the removal of the wooden building in 1967, the lot has been allowed to deteriorate and is now overgrown with vegetation. This again has been due in large part to the State's insistence upon its ownership and the inability of the plaintiff to obtain reasonable concessions from it during the period of the 1960's. But at all times the plaintiff and its membership have continuously attended to and maintained the graveyard site at Kahaluu. At no time, except possibly during the eight years of school use, has the State (or any other party for that matter) done any maintenance on either of the parcels.

The evidence is clear that for over 100 years, except for the period of school use, [between] about 1880 and 1888, the sites at issue have been continuously and exclusively utilized and possessed by the plaintiff and its predecessors for church, graveyard, and related activities, although their use for strictly religious services have varied in extent, especially in more recent times.

The trial court found for the United Churches on the two-step theory that (1) any title to the lots which the government may have possessed was lost by operation of a reverter statute[1] which returned the lots to their "original grantor" (Victoria Kamamalu) upon discontinuance of school uses in 1888, and (2) that the United Churches acquired title from the heirs of Victoria Kamamalu by adverse possession.

---

[1] Laws 1864, at 46, superseding Civil Code 1859, § 752, which in turn replaced the School Lands Act of 1850. These statutes are discussed more fully *infra*.

On appeal the State contends that the lots have remained government property since at least 1850, when the School Lands Act of 1850, *infra*, provided that school and church lots "shall be reserved as government property". The State does not dispute the discontinuance of school uses in 1888, but interprets the reverter statute as requiring discontinuance of both school and church uses before reverter could occur. Since church uses continued until after the repeal in 1896 of the reverter statute, the State contends that the government's ownership has been absolute since 1896.

As discussed more fully below, this court agrees with the State's interpretation of the reverter statute. Because reverter failed to occur prior to repeal of the reverter statute, and because adverse possession cannot run against the sovereign, this court finds that the government has retained to this day its original title to the lots. This court further rejects the United Churches' alternate theory that the churches have acquired title by presumption of a lost grant. However, the churches' continuous occupation of the lots since mid-nineteenth century leads us to conclude that the State's title to the lots is subject to the churches' enjoyment of an equitable right akin to a prescriptive easement, entitling the churches to continue to use the lots for religious or educational purposes, without interference from the State, until such uses are abandoned.

## I.   THE INITIAL ACQUISITION OF TITLE BY THE GOVERNMENT

Although the trial court expressed some doubts whether the Hawaiian government ever possessed title to the lots, this court is satisfied that the government acquired title in mid-nineteenth century. Under *Knudsen v. Board of Education*, 8 Haw. 60, 66 (1890), and *In re Land Title*, 49 Haw. 537, 547-50, 425 P.2d 83, 89-91 (1967), a Makalena survey of a school or church lot[2] creates a presumption the lot was granted to the

---

[2] The disputed lots in both *Knudsen and Land Title* were school lots as opposed to church lots, but the *Knudsen* court made it clear that it was addressing "the nature and validity of the titles of a large majority of the sites of schoolhouses *and churches* throughout this Kingdom". 8 Haw. at 62 (emphasis added).

government for school or church purposes. *Knudsen* more specifically held that such a grant is presumed to have been made prior to enactment of the School Lands Act of 1850, which provided that such lots were to be reserved as government property and devoted to the purposes of education or religion. The 1850 Act stated:

> All sites for school houses and houses for public worship, now occupied and in use, and not owned by private parties . . . granted either by the government, or by individuals . . . with a view to promote the interests of education or religion, *shall be reserved as government property, devoted to the purposes above mentioned* . . . .

Penal Code & Laws of 1850, at 136; RLH 1925, at 2184 (emphasis added).[3]

In the instant case there is no evidence to rebut the presumption arising from the Makalena surveys that the Holualoa and Kahalu'u lots were reserved as government property pursuant to the 1850 Act. Given such reservation by operation of law, an express clause of reservation in the 1852 land commission award to Victoria Kamamalu was unnecessary. *Knudsen, supra,* 8 Haw. at 64.

## II. THE 1859 AND 1964 REVERTER STATUTES AND THE EFFECT OF REPEAL IN 1896

The 1850 Act, by providing that school and church lots "shall be reserved as government property, devoted to the purposes above mentioned", conferred on the government an estate in fee simple absolute. However, under an 1859 statute the government's interest in those lots which had been granted by private parties was diminished to a fee simple determinable, *i.e.*, a fee simple subject to a possibility of reverter. The 1859 statute provided:

> All sites for school houses and . . . public worship . . . which have been granted by or to the government, for the

---

[3] *Knudsen, supra,* explains that the clause "not owned by private parties" was "introduced for the purpose of excepting private schools, of which there are a few instances, mainly in Honolulu." 8 Haw. at 65.

purpose of promoting . . . education or religion, shall be reserved as government property, *so long as* they are devoted to the purposes for which they were granted . . .; *and in case they shall cease to be used* for the purposes for which they were granted, for not less than one year, they shall *revert* to the *original grantors,* or their representatives.

Civil Code 1859, § 752; RLH 1925, at 2185 (emphasis added). *See also* Laws 1864, at 46; RLH 1925, at 2186-2187. Thus the "original grantors" of school and church lots gained possibilities of reverter in such lots. But the government was presumably the "original grantor" in a number of instances,[4] in which event the government's possibility of reverter merged with its fee simple determinable so as to leave undiminished the government's fee simple absolute.

The 1859 reverter statute was repealed by an 1864 statute, which however contained a nearly identical reverter provision. Laws 1864, at 46. In 1896, the entire 1864 statute was repealed in a sentence, thus inter alia repealing the reverter clause. Laws 1896, c. 57 § 44.

In the instant case it is unnecessary to decide whether or not Victoria Kamamalu was the "original grantor" of the Holualoa and Kahalu'u lots and thereby possessed of a possibility of reverter under the 1859 and 1864 statutes. The events which would have triggered reverter, *i.e.,* discontinuance of school and church uses, failed to occur prior to repeal in 1896 of the 1864 statute. It is true that the trial court found a discontinuance of school uses on both lots after 1888, but this court interprets the reverter statutes as requiring a discontinuance of both school and church uses before reverter could

---

[4] The 1850 Act by its terms applied to lots "granted either by the government, or by individuals". As explained in In re Land Title, supra, 49 Haw. at 549-50, n. 20, 425 P.2d at 90-91, the government and future land commission awardees possessed joint claims in awarded land prior to the Great Mahele of 1848. In the instant case, where the presumed grant occurred sometime prior to the 1850 Act (and thus prior to the 1852 land commission award, but not necessarily prior to the Great Mahele), it is difficult to determine whether Victoria Kamamalu, the Hawaiian government, or both, should be deemed the "original grantor" of the two church lots.

occur. The language of the 1859 and 1864 reverter statutes, taken in conjunction with the broad language of the 1850 Act and with the fact that many of the early school teachers were also missionaries, indicates that religion and education were then deemed interrelated, joint purposes. Under a proper construction of the early statutes, the school and church lots were set aside to promote the joint purposes of education and religion, as those terms are broadly defined, and as opposed to the idea that some lots were granted solely for "education" in its limited modern sense while other lots were granted solely for "religion".[5]

The State now owns the Holualoa and Kahaluʻu lots in fee simple absolute, either under the theory that the Hawaiian government was the "original grantor" and has always owned both lots in fee simple absolute, or under the theory that the government's title, made defeasible by the 1859 reverter statute, ripened into fee simple absolute in 1896 when the 1864 reverter statute was repealed.[6]

### III. THE RIGHT OF THE SUCCESSORS OF THE ORIGINAL OCCUPANTS TO CONTINUED RELIGIOUS AND EDUCATIONAL USES OF THE LOTS UNTIL SUCH USES ARE ABANDONED

Although the fee to the Holualoa and Kahaluʻu lots is in the State, and although it is well established that adverse

---

[5] Thus it is not dispositive that the Makalena survey described the Holualoa lot as a "School lot" (as contrasted to the description of the Kahaluʻu lot as a "School and Church lot").

[6] The parties have not questioned the constitutionality of the extinguishment of possibilities of reverter by simple repeal of the 1864 statute. Possibilities of reverter (1) offend the policy underlying the rule against perpetuities: J. Gray, Rule Against Perpetuities, § 41 (4th ed. 1942); (2) pose a threat of automatic forfeiture contrary to the policy against forfeitures: Lehigh Valley R. Co. v. Chapman, 35 N.J. 177, 171 A.2d 653 (1961); and (3) tend to clog land titles: Trustees of Schools v. Batdorf, 6 Ill.2d 486, 130 N.E.2d 111 (1955). Most jurisdictions which have considered the issue have upheld statutes extinguishing longstanding possibilities of reverter. *See, e.g.,* Hiddleston v. Nebraska Jewish Education Society, 186 Neb. 786, 186 N.W.2d 904 (1971); Trustees of Schools v. Batdorf, *supra;* Gillis v. King County, 42 Wash.2d 373, 255 P.2d 546 (1953).

possession may not run against the sovereign,[7] this court further finds that the United Churches have acquired an equitable right, akin to a prescriptive easement, to continue to use the lots for religious and educational purposes until such uses are abandoned.

Our finding is based largely on those facts which the trial court relied upon in finding adverse possession as against the heirs of Victoria Kamamalu. But at the same time we affirm the trial court's rejection of the United Churches' alternate argument that the doctrine of a presumed lost grant of title should be applied in the instant case.

In contrast to the doctrine of adverse possession, the doctrine of a presumed lost grant, arising out of adverse, exclusive, and uninterrupted possession for a substantial number of years, may be applied against the sovereign. *United States v. Fullard-Leo,* 331 U.S. 256 (1947) (applying pre-annexation Hawaii law); *In re Kioloku,* 25 Haw. 357 (1920). However, the trial court concluded that any presumption of a lost grant of title in the instant case was rebutted by (1) the explicit Royal Patent grants of the lots to the Board of Education in 1882, (2) an application in 1911 by the United Churches' predecessor requesting a grant of the Kahalu'u lot (thus admitting a present lack of title), and (3) "subsequent events and conduct on the part of the plaintiff", apparently referring to written statements in the 1960's by various officers of the United Churches' parent organization in Honolulu, admitting that title is in the government. It is well established that the presumption of a lost grant may be rebutted. *In re Kioloku, supra,* 25 Haw. at 366; *United States v. Chavez,* 175 U.S. 509, 520 (1899). Further rebuttal of the lost grant theory is given in part I, *supra,* where we hold that title to the lots was vested in the government under the School Lands Act of 1850.

The trial court found that the presumption of a lost grant had been rebutted, despite the following evidence establishing a longstanding occupation of the lots by the United

---

[7] State v. Zimring, 52 Haw. 477, 478, 479 P.2d 205, 206 (1970); Application of Kelley, 50 Haw. 567, 581, 445 P.2d 538, 547 (1968).

Churches under a good faith claim of right: (1) continuous user since mid-nineteenth century;[8] (2) the United Churches' 1912 petition for a charter of incorporation (subsequently approved by the treasurer and governor of the Territory) in which an appendix purported to list "property now held by the United Churches" including "Land and building at Holualoa" and "Land and Building at Kahaluu"; (3) a 1939 warranty deed from the United Churches' parent organization to the County of Hawaii, purporting to grant a portion of the Kahalu'u parcel (obviously for road widening purposes); (4) a 1948 letter, from the territorial Commissioner of Public Lands to a third party interested in acquiring the Holualoa parcel, wherein the Commissioner stated that the parcel belonged to the United Churches' parent organization; (5) testimony by the current pastor of Moku'aikaua Church that when he checked the state tax maps in the early 1960's the lots were shown under the name of the United Churches' parent organization; and (6) testimony by the pastor that "the people" had told him "we own it [the lots]. We owned it ever since the early 1880's."

Although we are constrained to agree with the trial court that the presumption of a lost grant of title has been rebutted by the circumstances outlined *supra*, nevertheless, the above evidence showing religious and educational uses by the United Churches and its predecessors since the infancy of modern Hawaiian property law, under a good faith claim of right, leads us to the conviction that, under the special facts of this case, justice requires our recognition that the United Churches possess limited equitable rights in the lots.

The above circumstances rebutting a lost grant rebut the existence of a grant of *title*. They do not rebut a presumption of a lost grant of lesser rights. In the law of prescriptive easements, it is well established that a lost grant of easements

---

[8] See the recital of facts and the long excerpt from the trial court's opinion set out at the beginning of this opinion.

may be presumed. *Lalakea v. Hawaiian Irrigation Co.*, 36 Haw. 692, 706 (1944), and cases cited therein. In furtherance of basic considerations of justice and equity, and by analogy with the law regarding presumed lost grants of easements, we hold that the United Churches possess equitable rights in the lots which entitle the churches to continue to use the lots for religious and educational purposes, including burial purposes, until such uses are abandoned.[9] The State, as holder of the title, is free to use and develop the lots so long as the State does not interfere substantially with religious and educational uses by the churches. As a matter of sound administrative policy, the State presumably will in any event give full consideration to the historical and cultural values which have attached to the lots.

The case is remanded for entry of judgment recognizing title in the State but also recognizing the enjoyment of equitable rights by the United Churches.

*Andrew S. O. Lee*, Deputy Attorney General, for Defendant-Appellant.

*Thomas P. Gill (Gill, Park & Park* of counsel) for Plaintiff-Appellee.

CONCURRING AND DISSENTING OPINION OF KOBAYASHI, J., WITH WHOM KIDWELL, J., JOINS

I concur with parts I and II of the opinion of the majority. However, in my opinion the legal conclusion of the majority in part III, as stated hereinafter, is not plausible, and is unsubstantiated by any probative findings of fact by the trial court or by the record or supported by any established principle of law.

---

[9] Although there is evidence in the record tending to show that abandonment may have occurred during the past decade, the trial court's opinion, as quoted *supra*, indicates that any abandonment has not been voluntary but has been induced by the State's insistence on its ownership of the lots.

The majority conclude that "the United Churches have acquired an equitable right, akin to a prescriptive easement". In my opinion, an "equitable right akin to a prescriptive easement" is a legal non-entity in property law. What is the substantive legal meaning and legal impact? The majority fail to be helpful by providing a definitive rationale and explanation. The majority further state: "Our finding is based largely on those facts which the trial court relied upon in finding adverse possession . . . ." Yet, the majority not only fail to state what findings of fact of the trial court are relied upon, but contradict themselves on their previous rejection of the same findings of fact and conclusions of law. In addition, the circumstances which rebut the presumption of a lost grant of title equally rebut a presumption of a lost grant of the equitable right.

I confess that my heart says: "Find some legal right on behalf of the United Churches!" But, regretfully, I conclude that the Unied Churches have no legal claim to the premises in question.